2014R00025/LMCJR/VK/JFI/DF

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Susan D. Wigenton |
| | : | |
| v. | : | Crim. No. 15- 209 (SDW) |
| | : | |
| DAVID WILDSTEIN | : | 18 U.S.C. §§ 241 and 371 |
| | : | |

## INFORMATION

The defendant having waived in open court prosecution by Indictment, the United States

Attorney for the District of New Jersey charges:

## COUNT 1

### (Conspiracy to Obtain by Fraud, Knowingly Convert, and Intentionally Misapply Property of an Organization Receiving Federal Benefits)

THE DEFENDANT

1.     During the time period relevant to Count 1 of the Information:

A.     Defendant DAVID WILDSTEIN ("defendant WILDSTEIN") was the Director of Interstate Capital Projects for the Port Authority of New York and New Jersey (the "Port Authority"). Defendant WILDSTEIN was an associate of William E. Baroni, Jr. ("Baroni"), the Deputy Executive Director of the Port Authority and its second highest ranking executive, and Bridget Anne Kelly ("Kelly"), an employee of the Office of the Governor of the State of New Jersey (the "Governor's Office") who served as Deputy Chief of Staff for Legislative and Intergovernmental Affairs ("IGA"). In or about May 2010, Baroni hired defendant WILDSTEIN for his Port Authority position, which defendant WILDSTEIN held until his resignation from the Port Authority became effective on or about December 13, 2013. Notwithstanding his title, defendant WILDSTEIN operated as Baroni's chief of staff and as the

second highest ranking New Jersey executive at the Port Authority. Defendant WILDSTEIN was an agent of the Port Authority, within the meaning of Title 18, United States Code, Section 666(d)(1).

OTHER INDIVIDUALS AND ENTITIES

B.      Baroni was appointed as the Deputy Executive Director of the Port Authority by the Governor of the State of New Jersey, Christopher J. Christie, in or about February 2010, and served in that position until his resignation on or about December 13, 2013. As the Deputy Executive Director of the Port Authority, Baroni, together with the Executive Director of the Port Authority (the "Executive Director"), was responsible for the general supervision of all aspects of the Port Authority's business, including the operations of Port Authority transportation facilities.   Baroni was an agent of the Port Authority, within the meaning of Title 18, United States Code, Section 666(d)(1).

C.      Kelly served as Deputy Chief of Staff for IGA from in or about April 2013 to on or about January 9, 2014. Prior to that appointment, Kelly was the Director of IGA, reporting to the previous Deputy Chief of Staff for IGA.

D.      The Port Authority was an organization that operated transportation and other facilities in New York and New Jersey. The Executive Director of the Port Authority was appointed by the Governor of New York, and the Deputy Executive Director was appointed by the Governor of New Jersey. The Port Authority also had a twelve-person Board of Commissioners, six of whom were appointed by the Governor of New Jersey (including the Chairperson) and six of whom were appointed by the Governor of New York (including the Vice-Chairperson).

E.      During the period beginning January 1, 2013 through December 31, 2013, the Port Authority received benefits in excess of $10,000 under Federal programs involving

2

grants, contracts, subsidies, loans, guarantees, insurance, or other forms of Federal assistance, within the meaning of Title 18, United States Code, Sections 666(b) and 666(d)(5).

F.    The George Washington Bridge ("GWB") was a facility owned and operated by the Port Authority that spanned the Hudson River between the Borough of Manhattan in New York and the Borough of Fort Lee in New Jersey ("Fort Lee"). The GWB had both an upper level and a lower level, each of which served both eastbound traffic into New York and westbound traffic into New Jersey. Vehicles traveling eastbound from New Jersey into New York paid tolls at one of three toll plazas: (1) the lower level toll plaza; (2) the upper level toll plaza; and (3) the toll plaza for the Palisades Interstate Parkway, which also led to the upper level of the GWB.

G.    The upper level toll plaza had twelve toll booths, which the Port Authority owned and operated. During normal operations, some of the twelve toll booths were designated to accept payment using only the electronic toll collection system known as "E-Z Pass," and others, serviced by toll booth operators, were designated to accept cash and E-Z Pass. The twelve toll booths at the upper level toll plaza of the GWB received traffic from two approaches: (1) what is known as the "Main Line," which included traffic from Interstate Highways 95 and 80, U.S. Route 46, and N.J. Route 4; and (2) an approach for local traffic traveling through the streets of Fort Lee (the "Local Approach"), which included a three-lane access road leading only to the upper level toll plaza (the "Local Access Lanes"). Traffic on the Main Line also fed into the ten toll booths at the lower level toll plaza of the GWB.

H.    Prior to September 9, 2013 and after September 13, 2013, during the weekday morning rush period from approximately 6 a.m. to 10 a.m. (also known as the "Peak Period"), the Port Authority typically used the three southernmost toll booths on the upper level toll plaza to handle the traffic traveling from the Local Access Lanes (the "Three Southernmost

3

Toll Booths"). Typically, during the Peak Period, one of the Three Southernmost Toll Booths was designated only for E-Z Pass use, while the other two toll booths were designated to accept both cash and E-Z Pass. During the Peak Period, the Port Authority used traffic cones to segregate the traffic from the Main Line from the traffic using the Local Access Lanes. The Local Access Lanes were not restricted to the exclusive use of the residents of Fort Lee.

I.      Mark J. Sokolich was the Mayor and a resident of Fort Lee ("Mayor Sokolich").

J.      Christopher J. Christie was the Governor of the State of New Jersey and a candidate for reelection in the New Jersey gubernatorial election conducted on November 5, 2013 ("Governor Christie").

K.      IGA was a component of the Governor's Office that monitored and facilitated the relationships between the Governor's Office and New Jersey state and local officials. IGA employed regional directors, each of whom was responsible for communicating with local officials, including mayors, in a particular region in New Jersey. Prior to November 5, 2013, certain IGA employees, including Kelly, also played a role in seeking endorsements of Governor Christie's 2013 reelection from elected officials in New Jersey. To that end, IGA's regional directors were instructed at times to invite New Jersey local officials who might endorse, or might be persuaded to endorse, Governor Christie's reelection to functions associated with Governor Christie. These included sporting and entertainment events to which Governor Christie had access to tickets and events at Governor Christie's official state residence. One of the officials whose endorsement IGA employees sought was Mayor Sokolich, who received invitations to some of those functions.

L.     The New Jersey Assembly Transportation, Public Works, and Independent Authorities Committee (the "Assembly Transportation Committee") was a New Jersey state legislative committee that investigated certain activities related to the Port Authority.

2.     From in or about August 2013 to in or about December 2013, in the District of New Jersey and elsewhere, defendant

DAVID WILDSTEIN

knowingly and intentionally conspired and agreed with others, including Baroni and Kelly, to obtain by fraud, otherwise without authority knowingly convert to their use and the use of others, and intentionally misapply property owned by and under the care, custody, and control of the Port Authority, with a value of at least $5,000, contrary to Title 18, United States Code, Section 666(a)(1)(A).

THE OBJECT OF THE CONSPIRACY

3.     The object of the conspiracy was to misuse Port Authority property to facilitate and conceal the causing of traffic problems in Fort Lee as punishment of Mayor Sokolich.

SUMMARY OF THE CONSPIRACY

4.     In or about August 2013, after Kelly confirmed that Mayor Sokolich would not be endorsing Governor Christie for reelection in November 2013, defendant WILDSTEIN and others, including Baroni and Kelly (the "Conspirators"), decided to punish Mayor Sokolich by deliberately causing significant traffic problems in Fort Lee through a reduction in the number of the Local Access Lanes—all under the false pretense of a traffic study.

5.     Between the mornings of September 9, 2013 and September 13, 2013, the Conspirators caused the Local Access Lanes to be reduced from three to one so that only one toll booth, instead of the usual three, was accessible to the Local Approach. To maximize the congestion and thus the punitive impact on Mayor Sokolich, the Conspirators caused these lane

and toll booth reductions to start on the first day of the school year in Fort Lee, without any advance notice to Mayor Sokolich, the Fort Lee Chief of Police, and the residents of Fort Lee. Just as the Conspirators had intended, the lane and toll booth reductions resulted in significant traffic in Fort Lee, both for motorists intending to access the GWB from the Local Approach and for the residents of Fort Lee, whose streets were choked with traffic backing up from the Local Approach.

6.    To enhance the effectiveness of their scheme, the Conspirators decided that any questions about the lane and toll booth reductions from Mayor Sokolich and other Fort Lee officials would be disregarded. To that end, the Conspirators purposely ignored communications from Mayor Sokolich, including his pleas for help, requests for information, and repeated warnings about the increased risks to public safety.

7.    Throughout the course of the conspiracy, the Conspirators concocted and promoted a sham story that reducing the number of lanes and toll booths accessible to the Local Approach was for a traffic study. They created and continually advanced this cover story so that they could use Port Authority property, including the time and services of unwitting Port Authority personnel and other resources, to implement the lane and toll booth reductions and to conceal the Conspirators' true punitive purpose.

MANNER AND MEANS OF THE CONSPIRACY

8.    To carry out the conspiracy and to effect its unlawful object, defendant WILDSTEIN and others, including Baroni and Kelly, engaged in a variety of means and methods including, among others, those described below.

9.    Between in or about March 2011 and on or about August 12, 2013, defendant WILDSTEIN had separate discussions with Baroni and Kelly about how they could use the Local Access Lanes as leverage against Mayor Sokolich.

10.    Prior to on or about August 12, 2013, Kelly expressed disappointment to defendant WILDSTEIN that Mayor Sokolich was not likely to endorse Governor Christie, despite IGA employees' efforts to obtain that endorsement. In response, defendant WILDSTEIN told Kelly that they could use the Local Access Lanes to cause traffic problems in Fort Lee whenever it would be advantageous to do so.

11.    On August 12, 2013, Kelly telephoned an employee of Governor Christie's reelection campaign who previously, as an IGA employee, had sought Mayor Sokolich's endorsement (the "Campaign Employee"). Kelly asked the Campaign Employee to confirm that Mayor Sokolich would not be endorsing Governor Christie. After the Campaign Employee confirmed that information, Kelly responded that it was all she needed to know.

12.    On August 13, 2013, having confirmed that Mayor Sokolich would not be endorsing Governor Christie for reelection, Kelly instructed defendant WILDSTEIN by email to implement their plan to punish Mayor Sokolich: "Time for some traffic problems in Fort Lee." Defendant WILDSTEIN acknowledged his assent by responding, "Got it," and communicated Kelly's instruction to Baroni. Baroni agreed that defendant WILDSTEIN should use the Local Access Lanes and the time and services of Port Authority personnel to cause traffic problems in Fort Lee.

13.    Soon thereafter, Kelly confirmed for defendant WILDSTEIN that Mayor Sokolich was not endorsing Governor Christie for reelection and that the changes to the Local Access Lanes and resultant traffic problems in Fort Lee would punish Mayor Sokolich for not endorsing. Both Baroni and defendant WILDSTEIN agreed to use the lanes for that purpose. To maintain consistency in dealing with Mayor Sokolich, Kelly also conveyed to certain IGA employees that they should no longer interact with him.

14. Reflecting their punitive purpose, on August 19, 2013, Kelly and defendant WILDSTEIN exchanged the following text messages regarding a rabbi, who, like Mayor Sokolich, had fallen into disfavor:

| SOURCE | TEXT |
|---|---|
| WILDSTEIN CELL | "And he [the rabbi] has officially pissed me off" |
| KELLY CELL | "Clearly" |
| KELLY CELL | "We cannot cause traffic problems in front of his house, can we?" |
| WILDSTEIN CELL | "Flights to Tel Aviv all mysteriously delayed" |
| KELLY CELL | "Perfect" |

15. Baroni, Kelly, and defendant WILDSTEIN agreed to use the cover story of a traffic study as a justification for unwitting Port Authority personnel whose services would be used to implement the changes to the Local Access Lanes and as a means of concealing the true punitive purpose of the plan. They further agreed that defendant WILDSTEIN would enlist the services of the Port Authority Engineering department to make the traffic study cover story seem legitimate.

16. Subsequently, defendant WILDSTEIN falsely told a Port Authority engineer (the "Engineer") that, to assess the traffic flow at the GWB upper level toll plaza, defendant WILDSTEIN was planning to remove the traffic cones that segregated the Main Line from the Local Approach. At defendant WILDSTEIN's direction, the Engineer and a Port Authority traffic engineer (the "Traffic Engineer") presented defendant WILDSTEIN with several alternative scenarios for altering the Local Access Lanes. In one such scenario, all of the traffic on the Local Access Lanes would merge from three lanes down to one and funnel into one toll booth. This single toll booth would service motorists using both cash and E-Z Pass, leaving no

lane accessible to the Local Approach that would be dedicated for E-Z Pass users. Defendant WILDSTEIN recommended that the single access lane and toll booth scenario would generate severe traffic problems in Fort Lee and inflict harsh punishment on Mayor Sokolich; Baroni and Kelly agreed.

17.    Defendant WILDSTEIN had separate discussions with Baroni and Kelly regarding the timing of the lane and toll booth reductions. Baroni recommended against implementing the reductions in August when travel was traditionally lighter and the punitive impact would be lessened. Baroni, Kelly, and defendant WILDSTEIN agreed that implementing the lane and toll booth reductions on September 9, 2013, which they knew was the first day of school for children in Fort Lee, would intensify Mayor Sokolich's punishment.

18.    To maximize the punitive impact of the lane and toll booth reductions, Baroni, Kelly, and defendant WILDSTEIN agreed not to give Mayor Sokolich and other Fort Lee officials advance notice. The lack of advance notice would prevent Fort Lee officials, including Fort Lee police officers, from preparing for the changes, and would keep Fort Lee residents and GWB commuters from altering their routes. They further agreed that the Port Authority and IGA would direct any resulting inquiries by Mayor Sokolich or other Fort Lee officials to Baroni as the Deputy Executive Director of the Port Authority. They also agreed that Baroni would then deliberately ignore Mayor Sokolich and any other Fort Lee officials who inquired about the reductions.

19.    To minimize the risk of detection or leaks, Baroni, Kelly, and defendant WILDSTEIN agreed that Port Authority personnel would be given short notice to implement the lane and toll booth reductions. Even though they had agreed for some time to start the reductions on Monday, September 9, 2013, at 6:00 a.m. – in time for the morning rush hour – defendant

WILDSTEIN, with the agreement of Baroni and Kelly, purposely waited until Friday, September 6, 2013, to order Port Authority personnel to implement the reductions.

20. During his communications with Port Authority personnel in preparation for the lane and toll booth reductions, defendant WILDSTEIN – consistent with his discussions with Baroni and Kelly – falsely claimed that the lane and toll booth reductions were for a traffic study. Based on this misrepresentation, Port Authority personnel took steps to implement the reductions and to assess their impact on traffic.

21. On Friday, September 6, 2013, defendant WILDSTEIN instructed a Port Authority manager with responsibility for the GWB (the "GWB Manager") to implement the lane and toll booth reductions on Monday, September 9, 2013, but not to notify any Fort Lee officials. After receiving defendant WILDSTEIN's directive, the GWB Manager: (A) arranged for Port Authority maintenance staff to cover traffic signs directing traffic to the Local Approach; (B) instructed GWB personnel to have an additional toll booth operator, who would be paid overtime, as a backup for the toll booth operator covering Toll Lane 24, the lone remaining toll booth that would be accessible to the Local Approach; and (C) arranged to have the Port Authority Police Department ("PAPD") work during an extended Peak Period to respond to additional traffic in Fort Lee from the Local Approach.

22. That same day, defendant WILDSTEIN also advised the Engineer that the lane and toll booth reductions would begin on the morning of Monday, September 9, 2013. Consequently, the Engineer contacted the Traffic Engineer and instructed him to monitor the traffic consequences of the lane and toll booth reductions. Similarly, a Port Authority supervisor, who had responsibilities for the Port Authority's Tunnels, Bridges, and Terminals department ("TB&T") (the "TB&T Manager"), discussed assessing the impact of the lane and toll booth reductions with one of the individuals who reported to him. Thus, on Friday, September 6, 2013

and during the lane and toll booth reductions, several Port Authority employees in the Traffic Engineering department and TB&T spent time collecting and reviewing traffic data, believing it was necessary to do so.

23.    The preparations for and implementation of the lane and toll booth reductions marked a clear departure from standard Port Authority traffic study procedures. These procedures normally do not necessitate or involve sudden, unannounced, and extreme disruptions for motorists, particularly during rush hour. Rather, the Port Authority ordinarily conducts traffic studies without actually affecting traffic, such as by using existing traffic data or computer models.

24.    Defendant WILDSTEIN kept Kelly and Baroni informed about the steps he was taking to implement the lane and toll booth reductions. For example, on Saturday, September 7, 2013, defendant WILDSTEIN sent an email to Kelly that stated, "I will call you Monday AM to let you know how Fort Lee goes," to which Kelly responded, "Great." Also, on Sunday, September 8, 2013, defendant WILDSTEIN forwarded to Baroni an email that defendant WILDSTEIN had received from the GWB Manager describing what Port Authority personnel had done to prepare for the lane and toll booth reductions and Port Authority resources that would be needed:

> Ops [Operations] is on board, Mtce [Maintenance] is covering signs tonight, and [Port Authority] Police are aware that they will be controlling traffic in the intersections for the extended rush. We've also brought a toll collector in on overtime to keep toll lane 24 (the extreme right hand toll lane Upper level) in the event the collector assigned to TL 24 needs a personal.

25.    On the morning of Monday, September 9, 2013, as Baroni, Kelly, and defendant WILDSTEIN intended, the lane and toll booth reductions caused significant traffic congestion for motorists traveling within Fort Lee. The congestion resulting from the reductions also spoiled

a legitimate Port Authority traffic study at Center and Lemoine Avenues in Fort Lee, which caused the Port Authority to repeat the study.

26.    On the first morning of the reductions – Monday, September 9, 2013 – defendant WILDSTEIN went to the GWB to observe the impact personally. In separate telephone conversations with Baroni and Kelly, defendant WILDSTEIN reported his observations that the lane and toll booth reductions had, as intended, caused terrible traffic in Fort Lee. Baroni and Kelly expressed satisfaction that their scheme was working and agreed to continue the reductions.

27.    Within hours of the lane and toll booth reductions, Baroni received an email that Mayor Sokolich had called "re: urgent matter of public safety in Fort Lee." Baroni forwarded the email to defendant WILDSTEIN, who responded by sending an email reiterating that Baroni should not respond: "radio silence." As Baroni, Kelly, and defendant WILDSTEIN had agreed, Baroni refused to contact or reply to Mayor Sokolich.

28.    Defendant WILDSTEIN forwarded to Kelly the email from Baroni about Mayor Sokolich's telephone call regarding an "urgent matter of public safety in Fort Lee." Later that day, Kelly and defendant WILDSTEIN exchanged emails confirming their strategy:

| SOURCE | TEXT |
| --- | --- |
| KELLY EMAIL | "Did he [Baroni] call him [Mayor Sokolich] back?" |
| WILDSTEIN EMAIL | "Radio silence<br>His name comes right after mayor Fulop" |
| KELLY EMAIL | "Ty [Thank you]" |

Defendant WILDSTEIN's mention of "Fulop" referred to the coordinated and deliberate refusal by the Conspirators to communicate with, meet, or respond to Steven Fulop, the Mayor of Jersey

City, beginning in or about late July 2013 because the Conspirators understood that Mayor Fulop was not endorsing Governor Christie's reelection.

29.    Later in the morning of September 9, 2013, Baroni, defendant WILDSTEIN, and the TB&T Manager received an email from a Port Authority employee who worked in the Government and Community Relations department (the "GOCOR Employee"). The email stated:

> Wanted you both have [*sic*] a heads up--[the Fort Lee] Borough Administrator, called me regarding the increased volume and congestion of AM rush traffic throughout the Borough as a result of the GWB toll lanes adjustment that occurred.
>
> She mentioned that there were 2 incidents that Ft Lee PD and EMS had difficulty responding to; a missing child (later found) and a cardiac arrest.
>
> She stated additionally that the Borough and PD had no advance notice of the planned change. Also, Bill the Mayor [Sokolich] had placed calls to your office.
>
> If there is anything you need me to do, let me know. Thank you.

Despite receiving the GOCOR Employee's email, with its references to a missing child and a medical emergency, Baroni and defendant WILDSTEIN refused to contact Mayor Sokolich or the Fort Lee Chief of Police about the safety concerns.

30.    In the afternoon of September 9, 2013, Kelly checked to see if Mayor Sokolich was reaching out elsewhere. To that end, Kelly sent an email to an IGA employee ("IGA Employee #1") asking, "Have you spoken to the Fort Lee Mayor?" IGA Employee #1 responded, "No, not in a while." Kelly also emailed the Campaign Employee, asking, "Have you heard from Sokolich in a while?" The Campaign Employee responded, "I haven't."

31.    Also on September 9, 2013, Kelly and defendant WILDSTEIN had a telephone conversation during which defendant WILDSTEIN reported to Kelly that the lane and toll booth

13

reductions had caused traffic problems in Fort Lee. Kelly instructed defendant WILDSTEIN to continue the reductions the following day; Baroni agreed with that instruction.

32.     On September 10, 2013, after the lane and toll booth reductions continued into a second day, Baroni received and deliberately ignored two text messages from Mayor Sokolich. One message stated:

> Bill: Mark Sokolich here . . . Port Authority has reduced the toll Boots [*sic*] for Fort Lee from three to only one. As of yesterday we are in total gridlock. Same thing today. Have a town that is ready to revolt. Who's mad at me? What do I do when Redevelopment 5 is online. Would not otherwise bother you however I have no choice. Please call me. Rather urgent.

The other message from Mayor Sokolich stated: "Presently we have four [*sic*] very busy traffic lanes merging into only one toll booth . . . . . The bigger problem is getting kids to school. Help please. It's maddening." Later that day, Baroni forwarded the second text message to defendant WILDSTEIN; defendant WILDSTEIN, in turn, forwarded that message to Kelly.

33.     After defendant WILDSTEIN received and forwarded to Kelly Mayor Sokolich's text message about the problem of getting children to school, Kelly and defendant WILDSTEIN exchanged text messages that stated, in pertinent part:

| SOURCE | TEXT |
| --- | --- |
| KELLY CELL | "Is it wrong that I am smiling?" |
| WILDSTEIN CELL | "No" |
| KELLY CELL | "I feel badly about the kids" |
| KELLY CELL | "I guess" |
| WILDSTEIN CELL | "They are the children of Buono voters . . . " |
| WILDSTEIN CELL | "Bottom line is he didn't say safety" |
| KELLY CELL | "Exactly!" |

14

Defendant WILDSTEIN's statement about "Buono voters" was a reference to supporters of New Jersey State Senator Barbara Buono, Governor Christie's principal opponent in the 2013 gubernatorial election. Despite Mayor Sokolich's pleas for help and information and his reference to schoolchildren stuck in traffic gridlock, Baroni did not respond to him.

34.    On September 10, 2013, Baroni received two communications regarding Mayor Sokolich's attempts to seek information about the lane and toll booth reductions. The first was an email from Baroni's assistant that read, in pertinent part: "Phone call: Mayor Sokolich (his office) . . . re: change of traffic patterns." The second was an email from the GOCOR Employee that stated, in pertinent part:

> Fort Lee Mayor Mark Sokolich called this morning regarding the traffic in Fort Lee[.]
>
> "reasons unclear to us . . ."
>
> The Mayor would like to talk to you as soon as possible, regarding the traffic congestion due to the change in GWB toll booths configuration. He remains concerned, doesn't understand the purpose/need of the traffic test and doesn't understand why the borough was not alerted. Additionally, he said that he is trying to "keep a lid on this" (politically) and is getting pressure from members of Borough Council who want to take some action. He feels this is a "life /safety" issue.

Baroni ignored and refused to respond to Mayor Sokolich's entreaties. Nor did Baroni even inquire of Mayor Sokolich or the Fort Lee Chief of Police about the nature of the "life/safety" issue.

35.    Also on September 10, 2013, Kelly and defendant WILDSTEIN had a telephone conversation during which defendant WILDSTEIN confirmed that the lane and toll booth reductions had caused traffic problems in Fort Lee. Kelly instructed defendant WILDSTEIN to continue the reductions the following day; Baroni agreed with that instruction.

36.    On September 11, 2013, Kelly and defendant WILDSTEIN had a telephone conversation during which defendant WILDSTEIN reported to Kelly that the lane and toll booth reductions again had caused traffic problems in Fort Lee. Kelly instructed defendant WILDSTEIN to continue the reductions the following day; Baroni agreed with that instruction.

37.    On September 12, 2013, Baroni received by email a letter from Mayor Sokolich that was marked "PERSONAL":

> I am writing this correspondence to you and am refraining from copying any other party in the hopes that a recent . . . decision by the Port Authority will be reversed quietly, uneventfully and without political fanfare.
>
> Permit me to elaborate. Without any notice whatsoever to Fort Lee (or any of its agencies, including our Police Department), the Port Authority reduced the available toll booths for traffic flowing through Fort Lee from three to one. Suffice it to say, this decision has wreaked havoc upon our community during the morning rush hour, visiting upon us complete gridlock. Having received absolutely no notice of this decision, not having obtained any response to our multiple inquiries concerning same, and try as we may to understand its rationale without the benefit of a response from the Port Authority, we are reaching the conclusion that there are punitive overtones associated with this initiative. What other conclusion could we possibly reach?
>
> Our emergency service vehicles are experiencing tremendous response time delays and my office is overwhelmed with complaints. <u>Unquestionably, this decision has negatively impacted public safety here in Fort Lee.</u> Adding insult to injury, many members of the public have indicated to me that the Port Authority Police Officers are advising commuters in response to their complaints that this recent traffic debacle is the result of a decision that I, as the Mayor, recently made. The basis, reason, or genesis of the decision is of no consequence to me; however, its profound and adverse impact on our community is of paramount importance to me.
>
> I have incessantly attempted to contact Port Authority representatives to no avail. Would you please be good enough to please have someone contact me or [the Fort Lee Chief of Police] to discuss the basis of this recent policy change and what we must do to reverse it . . . plain and simple. *Query:* What do I do when

> our billion dollar redevelopment is put on line at the end of the next year?
>
> Please call me as soon as possible in the hopes that we can resolve this issue and reverse a policy change that is wreaking havoc on Fort Lee . . . . the otherwise cooperative and supportive host community to the busiest bridge in the world.

(emphasis in original). Shortly after receiving Mayor Sokolich's letter, Baroni forwarded it by email to defendant WILDSTEIN, who then forwarded it to Kelly. As Baroni, Kelly, and defendant WILDSTEIN had agreed, Baroni deliberately ignored and refused to respond to Mayor Sokolich's letter, despite its explicit reference to issues of public safety and "complete gridlock."

38.    In addition to the letter, on September 12, 2013, Mayor Sokolich called the GOCOR Employee regarding the lane and toll booth reductions. The GOCOR Employee then sent a message for Baroni asking whether to return Mayor Sokolich's call. Baroni conveyed to the GOCOR Employee through coded language that the GOCOR Employee should not contact Mayor Sokolich.

39.    On September 12, 2013, Baroni also received a text message from Mayor Sokolich that stated, "My frustration is now trying to figure out who is mad at me." Baroni refused to respond and instead forwarded this text message to defendant WILDSTEIN.

40.    Also on September 12, 2013, in response to a media inquiry about the lane and toll booth reductions and the resulting traffic congestion in Fort Lee, defendant WILDSTEIN, with Baroni's knowledge and approval, caused the Port Authority's Media Relations department ("Media Relations") to issue a media statement that falsely claimed that: (A) "The Port Authority is reviewing traffic safety patterns at the George Washington Bridge to ensure proper placement of toll lanes"; and (B) the "PAPD has been in contact with Fort Lee throughout the transition."

17

Defendant WILDSTEIN sent a draft of this statement to Kelly before it was issued. Baroni, Kelly, and defendant WILDSTEIN knew that this statement was not true.

41.    That same day, Kelly received an email from an IGA employee ("IGA Employee #2") who summarized a telephone call that IGA Employee #1 had received from Mayor Sokolich. The email stated:

> This afternoon, [IGA Employee #1] received a call from Mayor Sokolich. It came from a number he was not familiar with that was actually a secretary who patched the Mayor through to [IGA Employee #1].
>
> The Mayor is extremely upset about the reduction of toll lanes from 3 to 1. Not only is is [sic] causing a horrendous traffic back up in town, First Responders are having a terrible time maneuvering the traffic because the back up is so severe.
>
> The Mayor told [IGA Employee #1] that he has no idea why Port Authority decided to do this, but there is a feeling in town that it is government retribution for something. He simply can't understand why that would be the case however, because he has always been so supportive of the Governor.
>
> Sokolich explained that the Council wants to organize a press conference with picketers at the foot of the bridge. The Mayor feels he is about to lose control of the situation and that he looks like a "f[***]ing idiot."
>
> [IGA Employee #1] told the fine Mayor he was unaware that the toll lanes were closed, but he would see what he could find out.

Kelly forwarded IGA Employee #2's email to defendant WILDSTEIN. As Baroni, Kelly, and defendant WILDSTEIN had agreed, despite receiving the email from IGA Employee #2 and its references to "horrendous traffic back up" and the problems facing first responders, Kelly did not contact Mayor Sokolich, or take any steps to address his concerns. Instead, Kelly responded to IGA Employee #2's email conveying that Mayor Sokolich was upset: "Good."

42.    On the morning of September 13, 2013, Baroni, among others, received an email from the Executive Director announcing that he had learned about and was ending the lane and

toll booth reductions. The Executive Director explained that he was doing so because, among other reasons: (A) the lane and toll booth reductions had been implemented without notifying Fort Lee, the commuting public, Media Relations, or the Executive Director; and (B) the lane and toll booth reductions had engulfed the entire Fort Lee area in severe traffic delays and had resulted in delays to emergency vehicles.

43.    After sending this email, the Executive Director copied Baroni on an email that he sent to the head of Media Relations, asking how the Port Authority could inform the public that the lane and toll booth reductions had ended. Baroni emailed the Executive Director that they "need[ed] to discuss prior to any communications" and that "[t]here can be no public discourse."

44.    Later that day, Baroni met with the Executive Director on two occasions. Baroni demanded that the Executive Director immediately reinstate the lane and toll booth reductions because the reductions were important to "Trenton." The Executive Director refused Baroni's demand.

45.    Also on September 13, 2013, in response to a media inquiry about the lane and toll booth reductions and the resulting traffic in Fort Lee, Baroni and defendant WILDSTEIN drafted, approved, and caused Media Relations to issue a second false and misleading media statement: "The Port Authority has conducted a week of study at the George Washington Bridge of traffic safety patterns. We will now review those results and determine the best traffic patterns at the GWB. We will continue to work with our local law enforcement partners."

46.    After the lane and toll booth reductions ended, Baroni, Kelly, and defendant WILDSTEIN continued their agreement to use Port Authority resources to advance their cover story. They also agreed that Baroni would continue to respond with deliberate silence to Mayor Sokolich's requests for an explanation of the reductions.

47.     On September 16, 2013, in response to another media inquiry, Baroni instructed Media Relations to re-issue the same false and misleading media statement that he and defendant WILDSTEIN had drafted and approved on Friday, September 13, 2013.

48.     On September 17, 2013, Mayor Sokolich sent the following text messages to Baroni:

> We should talk. Someone needs to tell me that the recent traffic debacle was not punitive in nature. The last four reporters that contacted me suggest that the people they are speaking with absolutely believe it to be punishment. Try as I may to dispel these rumors I am having a tough time.
>
> A private face-to-face would be important to me. Perhaps someone can enlighten me as to the errors of my ways. Let me know if you'll give me 10 minutes. Regards Mark

49.     Baroni immediately forwarded Mayor Sokolich's text messages to defendant WILDSTEIN and noted that they were from "Serbia," referring to Mayor Sokolich (who is actually of Croatian descent). Defendant WILDSTEIN then forwarded them to Kelly and sought instructions about how to respond. That same day, defendant WILDSTEIN exchanged multiple messages with Baroni and Kelly as they coordinated the response to Mayor Sokolich's texts. [Defendant WILDSTEIN's communications with Baroni are unshaded and defendant WILDSTEIN's communications with Kelly are shaded in black]:

| SOURCE | RECIPIENT | TEXT |
|---|---|---|
| BARONI CELL | WILDSTEIN CELL | "Serbia???" |
| WILDSTEIN CELL | BARONI CELL | "Have not heard back fr Bridget" |
| BARONI CELL | WILDSTEIN CELL | "Fck" |
| WILDSTEIN CELL | KELLY CELL | "Please let me know instructions" |
| KELLY CELL | WILDSTEIN CELL | "Just finishing a meeting" |
| WILDSTEIN CELL | KELLY CELL | "Ok. I'm in board meeting but can step out to call when you're ready" |

20

| SOURCE | RECIPIENT | TEXT |
|---|---|---|
| WILDSTEIN CELL | BARONI CELL | "Bridget; Just finishing a meeting" |
| WILDSTEIN CELL | BARONI CELL | "So we will speak soon" |
| BARONI CELL | WILDSTEIN CELL | "We could sched a meeting to stave off reporters then pull a faps" |
| WILDSTEIN CELL | BARONI CELL | "Like for Monday?" |
| BARONI CELL | WILDSTEIN CELL | "Too cute. Tuesday or later next week." |
| WILDSTEIN CELL | BARONI CELL | "Ok" |
| WILDSTEIN CELL | KELLY CELL | "Baroni crazed so let me know when to call, I have something at 3 I can't walk out of" |

"[P]ull a faps" referred to Baroni's and defendant WILDSTEIN's strategy of scheduling a meeting that they intended all along to cancel, as they did with FAPS, Inc. ("FAPS"), a Port Authority tenant, to punish Mayor Fulop, who had represented FAPS.

50. On September 17, 2013, Baroni caused his assistant to schedule a meeting with Mayor Sokolich, although Baroni intended to cancel. Before Baroni could cancel the meeting, however, Mayor Sokolich did so.

51. After the lane and toll booth reductions ended, Baroni and defendant WILDSTEIN discussed obtaining Port Authority traffic data to assist them in further developing the fiction that the reductions had been for a traffic study. On September 24, 2013, pursuant to that discussion, defendant WILDSTEIN obtained Port Authority traffic data from a Port Authority employee.

52. In or about November 2013, with Kelly's knowledge, Baroni and defendant WILDSTEIN prepared a misleading written statement for a Port Authority report that would falsely represent that the reductions were for a traffic study. To prepare that written statement, Baroni and defendant WILDSTEIN improperly used Port Authority resources, including the time and services of Port Authority personnel.

21

53. On November 20, 2013, Baroni was invited to testify on November 25, 2013 before the Assembly Transportation Committee, which was investigating the lane and toll booth reductions. As a result, with Kelly's knowledge, Baroni and defendant WILDSTEIN converted the draft of the false and misleading written statement into Baroni's prepared opening testimony.

54. On November 22, 2013, while preparing for his upcoming testimony, Baroni had conversations with two PAPD officers, during which Baroni sought to enlist their assistance in falsely corroborating that the PAPD had suggested a traffic study of the Local Access Lanes. Both PAPD officers told Baroni that the PAPD had had no such involvement.

55. On November 25, 2013, Baroni appeared before the Assembly Transportation Committee and, with the knowledge and agreement of Kelly and defendant WILDSTEIN, provided false and misleading testimony about the lane and toll booth reductions. During his testimony, Baroni knowingly and intentionally made the following misleading statements and false representations, among others:

A. Communications between members of the PAPD and defendant WILDSTEIN triggered the lane and toll booth reductions.

B. The lane and toll booth reductions were part of a one-week traffic study.

C. The failure to communicate with Fort Lee and the Executive Director was simply the result of communication breakdowns at the Port Authority.

In particular, with respect to what he repeatedly insisted were communication breakdowns with Fort Lee, Baroni did not admit that he intentionally maintained "radio silence" toward Mayor Sokolich, but instead testified falsely, "[t]he communication was flawed internally, the communication was flawed with our neighbors—no question. And I'm—given the amount of time I've spent building a relationship with Mark Sokolich—hugely problematic, personally."

56.    On November 25, 2013, Baroni, Kelly, and defendant WILDSTEIN caused public statements to be prepared by others in support of Baroni's testimony before the Assembly Transportation Committee.

57.    On December 12, 2013, Kelly telephoned IGA Employee #2 and discussed their September 12, 2013 email exchange, referred to above in Paragraph 41, in which IGA Employee #2 recounted IGA Employee #1's conversation with Mayor Sokolich about the traffic problems and to which Kelly responded, "Good." During their conversation, Kelly asked IGA Employee #2 to delete that email exchange.

58.    On December 13, 2013, the day on which the resignations of Baroni and defendant WILDSTEIN from the Port Authority became effective, Kelly falsely claimed that she had nothing to do with the lane and toll booth reductions.

## OVERT ACTS

59.    In furtherance of the conspiracy and to effect its unlawful object, the following overt acts were committed in the District of New Jersey and elsewhere:

A.    On August 13, 2013, Kelly sent defendant WILDSTEIN an email stating, "Time for some traffic problems in Fort Lee."

B.    On August 13, 2013, shortly after receiving Kelly's email, defendant WILDSTEIN acknowledged his assent to Kelly's instruction by responding, "Got it."

C.    Subsequently, on or about August 13, 2013, defendant WILDSTEIN informed Baroni of Kelly's instruction to cause traffic problems in Fort Lee, and Baroni agreed that defendant WILDSTEIN should take steps to implement Kelly's instruction.

D.    On or about August 28, 2013, defendant WILDSTEIN contacted the Engineer and falsely represented that defendant WILDSTEIN was planning to order the removal

23

of the traffic cones that segregated the Main Line from the Local Approach to assess the traffic flow at the GWB upper level toll plaza.

E.    On September, 6, 2013, defendant WILDSTEIN had a telephone conversation with the GWB Manager during which: (1) he directed the GWB Manager to implement the lane and toll booth reductions starting on September 9, 2013 at 6:00 a.m., in time for the morning rush; (2) he falsely represented to the GWB Manager that these reductions were being implemented to conduct a traffic study; and (3) he directed the GWB Manager not to notify any Fort Lee officials about the impending reductions.

F.    On September 6, 2013, defendant WILDSTEIN had a telephone conversation with the TB&T Manager, during which: (1) he told the TB&T Manager that the lane and toll booth reductions would be implemented starting on the morning of September 9, 2013; and (2) he falsely represented to the TB&T Manager that these reductions were being implemented to conduct a traffic study.

G.    On September 6, 2013, defendant WILDSTEIN had a telephone conversation with the Engineer during which he told the Engineer that the lane and toll booth reductions would be implemented starting on the morning of September 9, 2013.

H.    On September 7, 2013, defendant WILDSTEIN sent Kelly an email in which defendant WILDSTEIN stated that he would inform Kelly on the morning of September 9, 2013 of the impact of the lane and toll booth reductions.

I.    On September 8, 2013, defendant WILDSTEIN forwarded to Baroni an email from the GWB Manager describing Port Authority resources being used to implement the lane and toll booth reductions.

J.    On September 9, 2013, at approximately 6:00 a.m., Baroni, Kelly, and defendant WILDSTEIN caused the lane and toll booth reductions to become effective.

24

K.    On September 9, 2013, after receiving an email from Baroni indicating that Mayor Sokolich had called Baroni that morning "re: urgent matter of public safety in Fort Lee," defendant WILDSTEIN responded to Baroni by sending an email that stated: "radio silence."

L.    On September 9, 2013, Kelly sent defendant WILDSTEIN an email, thanking defendant WILDSTEIN for confirming that Baroni maintained "[r]adio silence" toward Mayor Sokolich.

M.    On September 9, 2013, Kelly emailed IGA Employee #1 to check whether IGA Employee #1 had spoken to Mayor Sokolich.

N.    On September 9, 2013, Kelly emailed the Campaign Employee to ask whether the Campaign Employee had heard from Mayor Sokolich in a while.

O.    On September 9, 2013, Kelly told defendant WILDSTEIN by telephone to continue the lane and toll booth reductions on September 10, 2013.

P.    On September 10, 2013, Kelly told defendant WILDSTEIN by telephone to continue the lane and toll booth reductions on September 11, 2013.

Q.    On September 11, 2013, Kelly told defendant WILDSTEIN by telephone to continue the lane and toll booth reductions on September 12, 2013.

R.    On September 12, 2013, Baroni forwarded to defendant WILDSTEIN Mayor Sokolich's September 12, 2013 letter regarding the impact of the lane and toll booth reductions.

S.    On September 12, 2013, defendant WILDSTEIN forwarded to Kelly Mayor Sokolich's September 12, 2013 letter regarding the impact of the lane and toll booth reductions.

T.      On September 12, 2013, Baroni conveyed to the GOCOR Employee through coded language that the GOCOR Employee should not contact Mayor Sokolich.

U.      On September 12, 2013, Baroni forwarded to defendant WILDSTEIN a text message from Mayor Sokolich that stated, "My frustration is now trying to figure out who is mad at me."

V.      On September 12, 2013, Baroni and defendant WILDSTEIN drafted and approved a false and misleading media statement claiming that the lane and toll booth reductions were done to review traffic safety patterns at the GWB.

W.      On September 12, 2013, Kelly forwarded to defendant WILDSTEIN an email from IGA Employee #2 regarding a telephone call from Mayor Sokolich to IGA Employee #1 about the traffic problems in Fort Lee.

X.      On September 12, 2013, Kelly responded to IGA Employee #2's email about the telephone call from Mayor Sokolich to IGA Employee #1, stating, "Good."

Y.      On September 13, 2013, Baroni told the Executive Director by email that they "need[ed] to discuss prior to any communications" and that "[t]here can be no public discourse."

Z.      On September 13, 2013, Baroni demanded that the Executive Director reinstate the lane and toll booth reductions because the reductions were important to "Trenton."

AA.     On September 13, 2013, Baroni and defendant WILDSTEIN drafted and approved a second false and misleading media statement claiming that the lane and toll booth reductions were done to conduct a week of study of traffic safety patterns at the GWB.

BB.     On September 16, 2013, Baroni instructed Media Relations to re-issue the false and misleading media statement that he and defendant WILDSTEIN had drafted and approved on September 13, 2013.

CC.    On November 25, 2013, Baroni provided false and misleading testimony regarding the lane and toll booth reductions to the Assembly Transportation Committee.

DD.    On December 12, 2013, Kelly asked IGA Employee #2 to delete their September 12, 2013 email exchange regarding a telephone call from Mayor Sokolich, as referred to above in Paragraph 41.

In violation of Title 18, United States Code, Section 371.

27

## COUNT 2

### (Conspiracy Against Civil Rights)

1.      Paragraph 1 and Paragraphs 3 to 59 of Count 1 are realleged and incorporated by reference as though fully set forth in this Count.

#### THE CONSPIRACY

2.      Between in or about August 2013 and on or about September 13, 2013, in the District of New Jersey and elsewhere, defendant

### DAVID WILDSTEIN

knowingly and willfully conspired and agreed with others, including Baroni and Kelly, to injure and oppress the residents of Fort Lee in the free exercise and enjoyment of the rights and privileges secured to them by the Constitution and laws of the United States, namely, the right to localized travel on public roadways free from restrictions unrelated to legitimate government objectives.

#### THE OBJECT OF THE CONSPIRACY

3.      The object of the conspiracy was to interfere with the localized travel rights of the residents of Fort Lee for the illegitimate purpose of causing significant traffic problems in Fort Lee to punish Mayor Sokolich.

#### MANNER AND MEANS OF THE CONSPIRACY

4.      To carry out the conspiracy and to effect its unlawful object, defendant WILDSTEIN and others, including Baroni and Kelly, engaged in a number of means and methods, including those referred to in Paragraphs 8 to 58 of Count 1, among others, and those described below.

28

5. Baroni, Kelly, and defendant WILDSTEIN chose the first day of school in Fort Lee to implement the lane and toll booth reductions to maximize the impact of the reductions and create as much traffic and disruption as possible in Fort Lee.

6. Baroni, Kelly, and defendant WILDSTEIN purposely selected a strategy that merged traffic that ordinarily fed into the Three Southernmost Toll Booths into one lane leading to one toll booth that was designated for use by all vehicles whether the motorists paid the toll by cash or E-Z Pass.

7. Baroni, Kelly, and defendant WILDSTEIN agreed that no advance warning of the lane and toll booth reductions would be provided to the public so that motorists using the Local Approach and residents of Fort Lee could not anticipate delays, adjust their travel plans, or otherwise prepare for the anticipated disruption caused by the traffic.

8. Baroni, Kelly, and defendant WILDSTEIN agreed that, to exacerbate the impact of the reductions, no advance notice of the lane and toll booth reductions would be provided to Mayor Sokolich or the Fort Lee Chief of Police.

9. To minimize the risk of detection and leaks, Baroni, Kelly, and defendant WILDSTEIN purposely gave short advance notice to Port Authority personnel on or about Friday, September 6, 2013 to implement the lane and toll booth reductions on Monday morning, September 9, 2013.

10. Baroni, Kelly, and defendant WILDSTEIN agreed that the Port Authority and IGA would maintain "radio silence" toward Mayor Sokolich, even when Mayor Sokolich advised on multiple occasions that the lane and toll booth reductions were adversely affecting Fort Lee and were posing increased risks to public safety.

11.    During the lane and toll booth reductions, despite receiving updates on the serious traffic congestion that they were inflicting upon Fort Lee and its residents, Baroni, Kelly, and defendant WILDSTEIN agreed that the reductions should continue each day.

In violation of Title 18, United States Code, Section 241.

 

 

PAUL J. FISHMAN
UNITED STATES ATTORNEY

CASE NUMBER: _____

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

v.

## DAVID WILDSTEIN

# INFORMATION FOR

Title 18, United States Code, Sections 241 and 371

### PAUL J. FISHMAN

*UNITED STATES ATTORNEY, NEWARK, NEW JERSEY*

LEE M. CORTES, JR.
VIKAS KHANNA
DAVID W. FEDER
*ASSISTANT U.S. ATTORNEYS*
*NEWARK, NEW JERSEY*
*973-645-2742*