

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*
*Special Prosecutions Division*

---

970 Broad Street, Suite 700  (973) 645-2700
Newark, New Jersey 07102

**CONFIDENTIAL**
**REQUESTED TO BE MAINTAINED**
**UNDER SEAL**

July 6, 2017

*VIA COURTHOUSE AND ELECTRONIC MAIL*

The Honorable Susan D. Wigenton
United States District Judge
Martin Luther King Building
    & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

Re:   *United States v. David Wildstein*, Crim. No. 15-209 (SDW)

Dear Judge Wigenton:

Pursuant to a plea agreement, defendant David Wildstein pled guilty on May 1, 2015 to a two-count Information, Crim. No. 15-209 (SDW), that charged him with conspiracy to obtain by fraud, knowingly convert, and intentionally misapply property of an organization receiving federal benefits in violation of 18 U.S.C. § 371 (Count 1) and conspiracy against civil rights in violation of 18 U.S.C. § 241 (Count 2). Wildstein is scheduled to be sentenced by the Court on July 12, 2017 at 11:00 a.m.

As the Court is aware, David Wildstein was the Director of Interstate Capital Projects at the Port Authority of New York and New Jersey (the "Port Authority") until his resignation in December 2013. While at the Port Authority, Wildstein, along with William E. Baroni, Jr., the Port Authority's Deputy Executive Director and Wildstein's immediate superior, and Bridget Anne Kelly, the Deputy Chief of Staff for Legislative and Intergovernmental Affairs ("IGA") in the Office of the Governor of the State of New Jersey, participated in a criminal scheme to misuse the resources of the Port Authority, including the George Washington Bridge (the "GWB"), to deliberately manufacture traffic problems in the Borough of Fort Lee, New Jersey in September 2013 by suddenly and without warning reducing the lanes and toll booths dedicated to local traffic from the borough (the "Bridge Scheme"). Baroni, Kelly, and Wildstein defrauded and misused the property of the Port Authority and interfered with the travel rights of the residents of Fort Lee in order to punish the Mayor of Fort Lee, Mark Sokolich, for not endorsing New Jersey Governor Christopher J. Christie for reelection in November 2013.

Prior to entering his plea, Wildstein agreed to cooperate with the United States, and the United States agreed to inform the sentencing judge and the United States Probation Office ("Probation") of the nature, extent, and value of his cooperation. Please accept this letter in fulfillment of that agreement and in support of the motion of the United States to depart from the applicable guideline range based on Wildstein's very substantial and extremely useful assistance in the investigation and prosecution of the individuals referenced in this letter.

In the truest sense, Wildstein has fully complied with the letter and spirit of his plea and cooperation. He fully accepted responsibility for his criminal acts and other behavior. He provided timely, complete, and truthful information and testimony about the Bridge Scheme and other matters. His cooperation led directly to the indictment and convictions of Baroni and Kelly. ███████████████████████████████████████████████████████████████ Put simply, were it not for Wildstein's decision to cooperate and disclose the true nature of the lane reductions, there likely would have been no prosecutions related to the Bridge Scheme.

Based upon his substantial assistance in the investigation and prosecution of others, as detailed below, the Government respectfully moves the Court to depart from the advisory range pursuant to the U.S. Sentencing Guidelines and impose a non-custodial sentence of probation upon David Wildstein.

### WILDSTEIN'S SENTENCING RANGE

As calculated in the plea agreement, the offense level for Wildstein's conduct pursuant to the advisory U.S. Sentencing Guidelines is 16. Probation has calculated the offense level as 18, based on an additional two-point enhancement for obstruction of justice. Presentence Investigation Report ("PSR") ¶ 93. Probation has explained that the obstruction enhancement is warranted because of Wildstein's participation in Baroni's false and misleading testimony to the New Jersey Assembly Transportation, Public Works, and Independent Authorities Committee (the "Assembly Transportation Committee") on November 25, 2013. Probation has further noted that obstruction enhancement was applied by the Court to Baroni's offense level.

The Government requests that the Court apply the offense level provided in the plea agreement and not apply the obstruction enhancement. The Government stipulated in the plea agreement with Wildstein that there should be no enhancement for obstruction. The Government is bound by that stipulation and stands by it. *See United States v. Badaracco*, 954 F.2d 928, 941 (3d Cir. 1992). In addition, the Government did not seek the application of the enhancement for Baroni based on his legislative testimony; only his perjury at trial (which, in part, consisted of Baroni's reiteration of that false legislative testimony). Although the Court considered Baroni's false legislative testimony in its decision to impose the obstruction enhancement on him, that was one factor that the Court considered along with Baroni's false trial testimony. In Wildstein's case, only his assistance in Baroni's legislative testimony is at issue, because Wildstein testified truthfully at trial. Consistent with its previous position, the Government does not believe that Wildstein's participation in Baroni's false legislative testimony, without more, merits the two-point obstruction enhancement.

Because Wildstein has zero criminal history points, he is in criminal history category I. If the Court applies an offense level of 16 (from the plea agreement), the resulting advisory Guidelines' range is 21 to 27 months' imprisonment and a fine of between $5,000 and $50,000. If the Court applies an offense level of 18 (from the PSR), the range is 27 to 33 months' imprisonment and a fine of between $6,000 and $60,000. PSR ¶¶ 115, 118, 166, 180.

### WILDSTEIN'S COOPERATION

Wildstein's cooperation in this matter predated the federal criminal investigation. That is because, even though Wildstein was the architect and a force behind the implementation and cover-up of the lane reductions, he was equally responsible for the public disclosure of their true nature. Following Baroni's incredible testimony before the Assembly Transportation Committee on November 25, 2013, that committee issued a subpoena for records to Wildstein. Rather than destroy the highly incriminating emails and text messages in his possession, as his coconspirator Bridget Kelly did, Wildstein instead produced those materials to the committee, knowing that they would become public in short order. They did on January 8, 2014. The next day, Wildstein was subpoenaed to testify before the Assembly Transportation Committee and invoked his right under the Fifth Amendment not to be a witness against himself. However, five days later, on January 14, 2014, Wildstein entered the U.S. Attorney's Office in Newark, New Jersey and admitted to his role in the Bridge Scheme. He admitted that there was no traffic study. He admitted that the motive for the scheme was to punish Mayor Sokolich for failing to endorse Governor Christie for reelection.

Beginning that day and on several other occasions from January 2014 to March 2014, Wildstein spoke with law enforcement for hours and provided, in painstaking detail, an account of all aspects of the Bridge Scheme and his activities at the Port Authority. During these meetings, Wildstein did not receive a commitment from the Government that he would not be charged criminally or offered a cooperation agreement. Wildstein explained his relationships with Baroni, Kelly, and others. Wildstein explained how Baroni and he came to the Port Authority with the mission of serving the political interests of the New Jersey Governor—their "one constituent"—and how they relentlessly carried out that mission. Among other things, Wildstein explained how Baroni and he used the Port Authority at the direction of IGA (including Kelly) as a "goody bag" by doling out items to New Jersey elected officials for the purpose of obtaining those officials' endorsement of Governor Christie's reelection. Wildstein also explained how Baroni, Kelly, and he previously had given the "radio silence" treatment to Jersey City Mayor Steven Fulop because he failed to endorse Governor Christie's reelection.

With respect to the Bridge Scheme, Wildstein admitted that it was his idea that the local access lanes to the GWB from Fort Lee could be used as leverage against Mayor Sokolich. Wildstein explained that he brought the idea to Baroni and Kelly and that he devised the false narrative of a "traffic study," which served as both the justification to implement the lane reductions at the Port Authority and as a cover story for their true punitive nature. Wildstein explained how he had schemed with Baroni and Kelly to make the impact of the lane reductions severe, by reducing the lanes from three down to one, by implementing them without any advance warning to Fort Lee, and by starting them on the first day of school. Although Kelly ordered it and

Baroni approved it, Wildstein admitted that he primarily handled the details of implementing the reductions at the Port Authority. And Wildstein admitted that, while the lane reductions were ongoing, like Baroni and Kelly, he too ignored and refused to respond to Mayor Sokolich's pleas for assistance and warnings about the increased risks to public safety during the week of the lane reductions. After they ended, Wildstein also admittedly furthered the cover up by continuing to advance the sham narrative of a traffic study, including assisting Baroni in providing false testimony about the lane reductions to the Assembly Transportation Committee.[1]

At all times during these meetings with the Government and throughout his cooperation, Wildstein completely accepted responsibility for his criminal activities. Wildstein never attempted to minimize his own role in any of his activities at the Port Authority or actions that he took before he joined the Port Authority, even where his words and deeds did not reflect well on him.

Critically, Wildstein's admissions with respect to the Bridge Scheme were corroborated by records that he turned over to law enforcement voluntarily and at the beginning of the investigation. Those records included materials from his email accounts and his phone (including his text messages with Baroni, Kelly, and others), his iPad, and his computers. During these meetings with law enforcement, Wildstein reviewed and explained hundreds of documents obtained from these sources. A large number of these corroborative emails and text messages were introduced during Wildstein's trial testimony.

Over the next several months, the details provided by Wildstein allowed the Government to obtain evidence that corroborated his account of the scheme, including the testimony of many other witnesses, emails, text messages, phone records, and other evidence, much of which was detailed in the Indictment of Baroni and Kelly and then offered at their trial. Wildstein's immediate cooperation also was a key part of assisting the Government in crafting search warrants that allowed the Government to obtain further evidence of the involvement of Baroni and Kelly in the Bridge Scheme, including evidence that Kelly had deleted her copies of the incriminating emails that Wildstein had preserved and turned over to the Government.

After several months of investigation, Wildstein again met with law enforcement on two occasions in November 2014. Wildstein still had not received a commitment from the Government that he would be offered a cooperation agreement. Wildstein again explained the details of the scheme and reviewed additional materials that the Government had obtained during the investigation. Again, Wildstein was candid about all aspects of the scheme and did not attempt to minimize his criminal conduct.

Subsequent to those meetings, Wildstein entered into agreements with the United States to plead guilty to two felony counts and cooperate. After executing those agreements, Wildstein met with the Government on approximately 14 occasions to prepare for his grand jury testimony. These meetings consisted primarily of Wildstein walking law enforcement officials through a nearly step-by-step account of the Bridge Scheme, from the time Wildstein had the idea in 2011 that the local access lanes could be used as leverage against the Mayor of Fort Lee until the public disclosure of the events in January 2014, and other events. These meetings included the review of hundreds of

---

[1] This information provided by Wildstein also came out during the trial of Baroni and Kelly.

records. Before entering his guilty plea, Wildstein then testified before the Grand Jury about the Bridge Scheme.

Following Wildstein's guilty plea and the indictment of Baroni and Kelly, Wildstein's cooperation continued as the Government prepared for trial. As the trial approached, Wildstein met with the Government on multiple occasions to prepare, spending hours reviewing various materials including emails, text messages, Port Authority records, and phone records. As the Court is aware, a large number of documents were introduced and explained by Wildstein at trial in a relatively streamlined and expeditious manner, given the sheer number of documents. In addition, Wildstein was forthcoming and accountable in discussing his own conduct and prior acts, some of which took place many years earlier, knowing full well that those acts would be disclosed to the attorneys for Baroni and Kelly and used to cross examine him at trial.

Finally, over eight days in September and October 2016, Wildstein testified at the trial of Baroni and Kelly. Wildstein testified in detail about the Bridge Scheme, introduced numerous documents regarding the scheme, and provided direct evidence that Baroni and Kelly were knowing and intentional participants in it. Wildstein's testimony about his conversations with Baroni and Kelly demonstrated that they knew that there was no traffic study, that Kelly's emails and texts actually meant what they stated (including her directive to Wildstein, "Time for some traffic problems in Fort Lee"), and that Baroni's legislative testimony was false and misleading. Because Your Honor presided over the trial, the Government will not recount the specifics of Wildstein's testimony in this letter, but many of the details of the testimony are included in the Government's Memorandum in Opposition to the Defendants' Post-Trial Motions in *Baroni & Kelly* that was filed on January 17, 2017 (Crim. No. 15-193 (SDW), Docket #311). Wildstein's testimony was honest, forthright, and corroborated by the numerous records (including contemporaneous emails and text messages) that were admitted during his testimony. Wildstein withstood an intensive cross examination, not only on his account of the Bridge Scheme, but also on the actions Wildstein took dating back many years. Throughout his testimony, regardless of the examiner, Wildstein candidly acknowledged his conduct and fulfilled his obligation pursuant to the cooperation agreement to tell the truth.



## *TORRES* FRAMEWORK ANALYSIS

Consistent with *United States v. Torres*, 251 F.3d 138 (3d Cir. 2001), in ruling on the Government's motion for a downward departure under Section 5K1.1, the Court must conduct "a qualitative, case by case analysis [and] also . . . examine Section 5K1.1's enumerated factors" as well as any other factor that the Court deems relevant. *Torres* further "urge[s] the sentencing judge to make specific findings regarding each factor" and notes that "it is incumbent upon a sentencing judge to . . . acknowledge § 5K1.1's factors in analyzing departure motions. In this case, the factors are: (a) the nature and extent of the defendant's assistance; (b) the significance and usefulness of the defendant's assistance; (c) the truthfulness, completeness, and reliability of the information that the defendant provided; (d) any danger or risk of injury to the defendant or his family resulting from his cooperation; and (e) the timeliness of the defendant's assistance.

Using the *Torres* framework, Wildstein's cooperation can be assessed as follows:

(a) *The nature and extent of the defendant's assistance.* For nearly three years, Wildstein met with the Government on numerous occasions to detail and provide a first-hand account of one of the more brazen public corruption schemes in the history of the State of New Jersey. Wildstein provided the Government with emails and text messages that corroborated his account. Wildstein then testified over eight days in a highly contested trial, and his testimony and the materials he supplied to the Government provided direct evidence of Baroni's and Kelly's guilt. In addition, Wildstein provided ▓▓▓▓▓▓▓▓▓▓▓▓▓ extensive background information regarding the Port Authority.

(b) *The significance and usefulness of the defendant's assistance.* Wildstein was the key cooperator against Baroni and Kelly. Without his cooperation, the Government likely would not have been able to obtain the public corruption convictions of Baroni and Kelly. Indeed, Wildstein's comprehensive and detailed descriptions of his interactions with Baroni and Kelly provided direct evidence of their participation in the Bridge Scheme, and the documentary evidence that he provided corroborated his testimony. Wildstein's testimony at trial was essential to bringing both Baroni and Kelly to justice. Moreover, Wildstein is the reason that the true nature of the lane reductions is known to the public. Despite his own culpability, Wildstein's decision to preserve his email and text messages and then to disclose them to the legislative committee—knowing that they would become public—is the reason the true nature of the scheme saw daylight. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ In sum, Wildstein's cooperation was highly significant and useful.

(c) *The truthfulness, completeness, and reliability of the information that the defendant provided.* Wildstein provided truthful, complete, and reliable information to the Government and at trial. Given the scope of the Bridge Scheme, Wildstein's ability to give a detailed and complete narrative of the criminal conspiracy was important to the Government's case. Wildstein's information also was reliable. Time and time again, Wildstein related events and information dating back months or years and the emails and text messages corroborated that information. Moreover, Wildstein did not attempt to make up details to "improve" his account. For example, with respect to two emails that Wildstein sent to Kelly—one during the summer of 2013 that

6

specifically referred to Fort Lee and another sent the day before Kelly sent her "Time for some traffic problems" email—Wildstein testified that he could not remember the details of those emails. Wildstein did not try to create an explanation for these emails and abided by his obligations pursuant to the cooperation agreement to testify truthfully, irrespective of which side his testimony would favor.

(d)     *Any danger or risk of injury to the defendant or his family resulting from his cooperation during the pendency of his cooperation.* Although no direct threats were made against Wildstein in connection with his cooperation, his cooperation required him to provide information about some of his closest friends and allies, some of whom he had relationships with for decades. As such, Wildstein's decision to cooperate came at significant personal cost to him.

(e)     *The timeliness of the defendant's assistance.* Wildstein's cooperation was timely and, in fact, preceded the federal investigation. Despite his criminal culpability, Wildstein, unlike Kelly, did not destroy his inculpatory emails and texts and, in effect, handed them over to be released to the public. Wildstein immediately began cooperating acknowledging his criminal involvement in the Bridge Scheme and exposing himself to prison without any cooperation agreement from the Government.

## CONCLUSION

Taking into account David Wildstein's cooperation and the circumstances described in this letter, a substantial downward departure from the applicable advisory Guidelines range is fair, just, and necessary. Cooperation by subjects of public corruption cases is absolutely critical to the Government's efforts to prosecute such crimes and bring their participants to justice. When a defendant gives up his right to contest the charges and chooses to cooperate fully and early, that defendant should benefit from his cooperation. When someone goes even farther and voluntarily discloses his crime and the corroborating evidence of that crime, a greater benefit is appropriate. That is what David Wildstein did and that is why the Government brings this motion.

Moreover, the Government believes firmly that a benefit to a cooperator like Wildstein serves the interests of justice and redounds to the public good. The interests of justice are served because it sends a message to current and future subjects of criminal prosecution that timely, complete, and truthful cooperation can have a meaningful impact on the eventual penalties for their crimes. The public also benefits because sending such a message to current and future subjects of criminal prosecution will lead to the exposure of criminal activity which otherwise might remain hidden.

Consequently, the United States respectfully requests that the Court, pursuant to Section 5K1.1 of the Sentencing Guidelines, depart downward from the otherwise applicable Sentencing Guidelines range and impose a non-custodial sentence on Wildstein. The Government believes that such a sentence reflects the extraordinary cooperation that Wildstein provided.

Thank you for your consideration.

                                      Respectfully submitted,

                                      WILLIAM E. FITZPATRICK
                                      Acting United States Attorney

                                      /s/ *Lee M. Cortes, Jr.*
                         By:    Lee M. Cortes, Jr.
                               Assistant U.S. Attorney

                                      /s/ *Vikas Khanna*
                         By:    Vikas Khanna
                               Assistant U.S. Attorney

                                      /s/ *David W. Feder*
                         By:    David W. Feder
                               Assistant U.S. Attorney

Enclosures

cc:    Alan L. Zegas, Esq.
       JoAnne Young, Senior U.S. Probation Officer