# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **Criminal No. 15-209** |
| v. | |
| DAVID WILDSTEIN, | |
| Defendant. | |

---

## MEMORANDUM AND EXHIBITS
## IN SUPPORT OF SENTENCING OF DAVID WILDSTEIN

---

**LAW OFFICES OF ALAN L. ZEGAS**
60 Morris Turnpike
Third Floor West
Summit, New Jersey 07901
(973) 379-1999
Attorneys for Defendant,
David Wildstein

*On the Memorandum:*
*    Alan L. Zegas, Esq.*

TABLE OF CONTENTS

SENTENCING AND PRESENTENCE INVESTIGATION REPORT ........................................ 1

PERSONAL BACKGROUND ................................................................................................ 1

MEDIA COMPANY FOUNDER AND JOURNALIST ........................................................ 9

PORT AUTHORITY OF NEW YORK AND NEW JERSEY .............................................. 11

BAYONNE BRIDGE .......................................................................................................... 13

GOETHALS BRIDGE .......................................................................................................... 14

PORT NEWARK CONTAINER TERMINAL ..................................................................... 15

GEORGE WASHINGTON BRIDGE SUSPENDER ROPE REPLACEMENT ................... 15

ADDITIONAL INFRASTRUCE MAINTENANCE PROJECTS ......................................... 16

SUPERSTORM SANDY ...................................................................................................... 16

ARC TUNNEL ..................................................................................................................... 17

AT THE PORT AUTHORITY ............................................................................................. 17

ACTIVITIES SINCE LEAVING THE PORT AUTHORITY ............................................... 21

COMMUNITY SERVICE .................................................................................................... 22

COOPERATION ................................................................................................................... 22

LETTERS OF ATTESTATION ........................................................................................... 24

CONCLUSION ..................................................................................................................... 42

EXHIBITS

Transcript of MSNBC Reporter Steve Kornacki ............................................................... A

Letter from Robyn Wildstein .............................................................................................. B

Letter from Dr. Luis Marrero .......................................................................... C

Letter from James Weinstein ........................................................................... D

Letter from Jordan Lieberman .......................................................................... E

Letter from Julie Roginsky ................................................................................ F

Letter from Arielle Schwartz ............................................................................ G

Letter from C. Louis Bassano .......................................................................... H

Letter from Drew Wildstein .............................................................................. I

Letter from Fritz Peterson ................................................................................ J

Letter from Charlie Hayes ............................................................................... K

Letter from Ken Kurson ................................................................................... L

Letter from Dr. Mary Osborne ........................................................................ M

Letter from Shirley-Mae Smith ....................................................................... N

Letter from Jeanne Silberman .......................................................................... O

Letter from Retired New Jersey Superior Court Judge, David Issenman .................... P

Letter from Marianne Ignar .............................................................................. Q

Letter from Steve Issenman .............................................................................. R

Article from The Record dated March 4, 2012 .................................................. S

Letter from William Ulrey ................................................................................ T

Letter from Raj Mukherji, Esq. ........................................................................ U

Michael Drewniak E-mail ................................................................................ V

## SENTENCING AND PRESENTENCE INVESTIGATION REPORT

David Wildstein stands before the Court for sentencing, after having cooperated with the government in advance of his plea agreement.   His cooperation continued extensively immediately after the plea, through the trial of Bridget Kelly and Bill Baroni, where Mr. Wildstein, the Government's chief witness, was on the witness stand for 8 days.



## PERSONAL BACKGROUND

David was born in Newark, New Jersey on September 21, 1961.  He grew up in Livingston, New Jersey, the oldest of two brothers and a sister.  At age 9, David suffered the loss of another sister, who died when she was only 8-months old.   David grew up in a close and loving family, where the value of hard work and integrity was taught. It was a family that spoke little of politics

and much of the New York Yankees over the dinner table.

Mr. Wildstein has been married for 25 years to his wife Robyn. The couple has raised three children. ▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Wildstein and Robyn spent 22 years living in Montville, New Jersey. Since 2015, they have lived in Sarasota, Florida. In a letter to this Court Robyn has referred to David as a "caring, loyal and kind, a wonderful husband, father, son, and friend…Together we have raised three children who have developed into thoughtful and decent young adults." Mr. Wildstein has worked hard throughout his life, achieving early success in politics and government, and then in the private sector. He has been a loyal friend, has donated his time to his community, and has contributed generously to charities.

In preparation for sentencing, Mr. Wildstein asked a few people who have known him for a long time and have been closest to him to write letters to the Court on his behalf. His intention was to provide an accurate representation of his life. The letters are not sanitized and do not contain fluff and spin. Like Mr. Wildstein's cooperation with the Government and his testimony at the trial, his intention is to provide the Court with a fair and unfiltered view of him.

As a young man, Mr. Wildstein had two great loves: politics and baseball. In 1973, at age 12, he volunteered on the campaign of New Jersey State Senator James H. Wallwork. After the campaign, the Senator hired Mr. Wildstein as a legislative aide. David was paid $100 per year for his work, which consisted of taking hard copies of bills introduced in the New Jersey Legislature and filing them as a part of a reference book for the Senator's use.

Mr. Wildstein also worked on the early campaigns of Thomas H. Kean, both for the State Assembly and for Congress; he took a bus to the Kean for Congress headquarters in Morristown to volunteer on that campaign. Mr. Wildstein continued to work on campaigns over the years, for Kean, when he ran for Governor in 1977, and for many other political candidates. He later

became the State Chairman New Jersey State Teenage Republicans, a post that was held ten years earlier by his dear friend, the late Congressman Bob Franks. Another former state Teenage Republican Chairman, Charles Poekel, was Mr. Wildstein's lawyer in 1978 when a Superior Court Judge ruled that at age sixteen, he was too young to file nominating petitions to run for the Republican County Committee in Livingston. In 2016, Poekel told a writer for New York Magazine: "It was like having a child prodigy as a musician, but he was a child prodigy as a politician. I would call him a political Mozart." http://nymag.com/daily/intelligencer/2016/09/Mr. Wildstein-wildstein-chris-christie-bridgegate-trial.html

Mr. Wildstein, who was not athletic, did not play baseball in middle school and high school, but he did serve as the team statistician. He attended all practices and games, sometimes traveling as an advance scout to learn about the opposition. When major league scouts would attend the Livingston High School games, Mr. Wildstein provided them with statistics so they would be acquainted with some of the players they were observing. Mr. Wildstein was proud to earn a varsity letter in baseball – the same one the players received – and he was even prouder when a couple of players were drafted out of Livingston High School by major league teams. In high school, Mr. Wildstein worked in a paid, part-time role for the *Star-Ledger* and *Daily Record*, covering high school sports.

In an interview with the *New Republic* in January 2014, Tony Hope, the former Livingston High School baseball coach, told a reporter: "Wildstein was our baseball statistician. He was a very quiet, unassuming, brilliant kid. He'd do the baseball stats like you wouldn't believe. He gave you the stats from the previous week's games, he had a brilliant mind for numbers and figures…. And he was doing it without any of the computers you have today. He's doing it all with a calculator, none of the fancy technology…You know, averages against righthander and against lefthander, that sort of thing…He knew the game but he wasn't at all a

3

player. I mean, not at all." The reporter, Alec MacGillis, even commented: "Young Wildstein was into sabermetrics before it was cool, sitting on the bench and providing the Lancers with data that helped make them one of the best teams in the state."   https://newrepublic.com/article/116177/chris-christie-did-know-Mr. Wildstein- wildstein-high-school-coach

     In prejudicial portrayals, the media and various defense counsel have sought to define Mr. Wildstein by exploiting and sensationalizing conduct of Mr. Wildstein from when in high school, or, not long after, when he was in public service at a very young age. ████████ ██████████████████████████████████████████████████████████Mr. Wildstein has not responded to various allegations that were outright false.  In one case, defense counsel at the trial of Kelly and Baroni relied, not on facts, but rather on a 37-year-old inaccurate representation of one weekly newspaper writer who failed to ask Mr. Wildstein, who was seventeen-years-old at the time, for comment. Mr. Wildstein has expressed regret and remorse for certain things he did as a very young man.  Most importantly, it was Mr. Wildstein who self-reported to the government each and every issue brought up during his testimony at trial.  The government turned Mr. Wildstein's information over to defense counsel. At trial, Mr. Wildstein, answered with complete honesty highly embarrassing questions asked of him about decades-old conduct.

     While attending George Washington University, Mr. Wildstein continued to be involved in politics.  He worked for Harold Stassen, a former presidential candidate who had been Governor of Minnesota and in the Eisenhower cabinet, and later as a paid legislative assistant to Congressman Christopher H. Smith of New Jersey.  Mr. Wildstein was twice elected to the Student Senate.

     In 1983, Mr. Wildstein managed the re-election campaign of New Jersey State Senator C. Louis Bassano, and later served on Bassano's legislative staff.  He served as Executive Director of the Essex County Republican Committee, the Bergen County Republican Organization, and

the Assembly Republican campaign committee.      He served as Chief of Staff to Assembly Minority Leader Chuck Hardwick. After Hardwick became Assembly Speaker, Mr. Wildstein was appointed Deputy Clerk of the New Jersey State Assembly.      In 2016, Hardwick told a reporter: "He was quite a phenom... The talk then was that he was going to be the first Jewish president of the United States." Source: http://nymag.com/daily/intelligencer/2016/09/Mr. Wildstein-wildstein-chris-christie-bridgegate- trial.html

Mr. Wildstein was elected to the Livingston Township Council in 1984, at age 23, and became Mayor of Livingston after the 1986 elections.  As a local official, Mr. Wildstein amassed an impressive list of accomplishments.  Livingston had spent more than a decade discussing plans to build public housing for senior citizens, but had little progress.  Under Mr. Wildstein's leadership, architectural plans, financing and planning board approval were finalized, and the project was turned over to a non- political Senior Housing Corporation.  He worked to secure nearly $400,000 in federal Community Development Block Grant funds to pay for infrastructure development for senior housing. (Source: Star Ledger, July 29, 1989)  Mr. Wildstein led an effort to replace inefficient leaf collection equipment, last purchased in the 1950's and 1960's, through his suggestion of a public works bond issue – solving an important, though not necessarily exciting local problem; he reduced the number of all-night gasoline stations after staff indicated that it would reduce crime; Mr. Wildstein implemented a merit pay system for township employees; he protected the rights of the handicapped through increased accessibility and greater public awareness and understanding; and Mr. Wildstein spearheaded a series of successful programs to enhance youth services, including a Teen Center and the first Project Graduation.

As a Councilman in 1986, Mr. Wildstein helped to save a pre-school for children with Down Syndrome. Stepping Stones, part of the Association for Retarded Citizens of Essex

County, was in its early years as an early intervention program for pre-school Down Syndrome children.  Located in the basement of the Trinity Covenant Church in Livingston.  In 1986, the pre-school was seeking a license from the New Jersey Department of Education, and hit a brick wall.  The church basement did not have the proper fire suppression system state regulations require of pre- schools.  It was in danger of closing.  Mr. Wildstein brought the issue to the local Assemblyman, who agreed to add funding for the fire suppression system in the state budget (as what was, in those days, referred to as "Christmas Tree" items).   There was some pushback from the Governor's office, which questioned using state funds to make a capital improvement to a church.  Mr. Wildstein went to Trenton, met with members of the Governor's staff, and convinced them to keep the budget item.  Later, Mr. Wildstein served on the Board of Directors of the Association for Retarded Citizens of Essex County.   He also served on the Board of Directors of the Livingston Community Hospital, the Livingston Babe Ruth League, and the Livingston Youth Service Bureau.  He coached Little League baseball for several years.

Mr. Wildstein's willingness to cut through bureaucratic issues to move government projects along at a faster-than-usual pace has often helped improve the quality of lives for the people  Government serves.  For example, in August of 1987, a 305% increase in Essex County disposal fees created a possible emergency: a cessation of garbage pickup for the Township of Livingston.  Mr. Wildstein called municipal and county officials, as well as the two privately-held trash haulers, into Township Hall for three days of negotiation, including a marathon ten-hour session.  The result was an emergency plan approved by the state Board of Public Utilities that resulted in no interruption in garbage pickup.  (Source: Star-Ledger, August 20, 1987)

In the earliest days of his public service, Mr. Wildstein was willing to advocate on behalf of people in need, even if it was not in his best interests.  He called for the township to fulfill its

6

obligation "to help and assist the homeless … (to) to share in the need to provide housing to families down on their luck" and urged the Council to "stand up to those who oppose such worthy causes and do the right thing." *Source: Statement of Mr. Wildstein M. Wildstein, December 19, 1988.* When Mr. Wildstein was Mayor, there was a local controversy regarding a group home for the mentally disabled in Livingston.  A large group of the neighbors strongly opposed a permit for the group home and came to a Council meeting to voice their disapproval.  Regardless of the clear political risk, Mr. Wildstein stood firm in his belief that this was the right decision, and strongly supported the permit.  This is an example of Mr. Wildstein putting principles ahead of politics.  The residents of the group home were not voters, and their families did not come from Livingston.  Politically, he had nothing to gain by taking this position.

Often, Mr. Wildstein proved a foreword-thinking public official.  He called for a parental leave program for Livingston township employees more than twenty years before the Legislature passed their own law.  After the NFL Giants proposed moving their training camp to Livingston – something that was initially popular – Mr. Wildstein exposed the project as a $300 million commercial real estate venture, backed by powerful political insiders, that would encroach upon the East Orange Water Reserve.  After he put a stop to the project, he pushed for the rezoning of the 1,400-acre East Orange Water Reserve as a conservation zone "to protect this valuable natural resource from greedy developers forever."  Mr. Wildstein pushed for a local public transportation system.  He sought more services for senior citizens.  He pushed for greater access to public facilities for the handicapped several years before Congress passed the Americans With Disabilities Act.  He established a program to train about 150 township employees in cardiopulmonary resuscitation (CPR).  A few months after the program began, one municipal employee was able to save a life using those skills.

When Livingston's first Township Manager retired in 1985 after 26 years, Mr. Wildstein participated in a national search for a replacement. The search was done without regard for partisan politics, and while the vote to hire Charles Tahaney, a non-political career government professional, was 3-2, the majority was based upon a bi-partisan coalition of the Council. Tahaney served until his own retirement in 2005. A reporter for *Blomberg News* sought out information regarding Mr. Wildstein's tenure in Livingston, Tahaney disputed partisan characterizations of his record, telling the reporter that Mr. Wildstein was "friendly" and that his behavior was "nothing out of the normal." Source: http://www.mercurynews.com/2014/02/02/wildstein-became-behind-the-scenes-operator-before-bridge- affair/

Essex County Executive Nicholas Amato nominated Mr. Wildstein to serve on the Essex County Vocational and Technical Board of Education, which operated several primarily urban public high schools and adult job training programs, in 1987; the Board of Chosen Freeholders, which was under Democratic control, voted unanimously to confirm his nomination. Mr. Wildstein led a national search for a new Superintendent of Schools. The process was intended to hire someone based solely on credentials, not politics. The result was the appointment of Greta D. Shepherd, a career educator who was an administrator for the Washington, D.C. public school system. Mr. Wildstein's colleagues on the school board elected him to serve as Vice President, as Chairman of the Personnel and Labor Relations Committee, and as Vice Chairman of the Finance Committee. He was a member of the Essex County Board of School Estimate.

In 1988, he declined to seek re-election to a second term. He had left politics as a vocation and joined his family business, Apache Mills, Inc.; Mr. Wildstein wanted to devote greater attention to that job. He spent nineteen years in his family business. It was there that he observed and learned strong management skills, where the metrics of success or failure is determined by a careful balance between profits and ethics. Mr. Wildstein learned that the

responsibility of a running a business includes a concern for the extended universe of families that business supports.  He was taught that people ought to be treated fairly and with dignity amidst a shared understanding that they were expected to do their jobs.   During his time in the private sector, Mr. Wildstein continued to be involved in the political career of his close friend, Bob Franks.  He volunteered on Mr. Franks' campaigns for Congress, U.S. Senator, and Governor.  They spoke on most days for nearly thirty years.  Mr. Wildstein serves as a Trustee of the Franks Family Trust.

Mr. Wildstein spent several years as a member of the Livingston Kiwanis Club, a community service organization.  He volunteered as the Zone Administrator for the New Jersey Key Club, and as the Kiwanis Advisor to the Livingston High School Key Club.

## MEDIA COMPANY FOUNDER AND JOURNALIST

Defense counsel sought to portray Mr. Wildstein as some nefarious blogger, as if to play upon the stereotypes that exist in today's political environment.  That is grossly inaccurate and unfair.  Mr. Wildstein built a highly successful media company from the ground up.  He was the editor of, and a columnist for, a serious, highly respected and widely read news site.  The term blogger is frequently used by print news reporters as a prejudicial method of diminishing the standing of competitor journalists, especially in an era where digital media has led to a rapid decline of the old-fashioned newspaper business.

When Mr. Wildstein opened *PoliticsNJ.com (later PolitickerNJ.com)* in February 2000, he was the first in New Jersey to cover news on the Internet, with updates throughout the day. At the time, it was a new and rather revolutionary concept.   Less than six weeks after PoliticsNJ was launched, the *New York Times* referred to it as "a hot new web site" and that "PoliticsNJ.com has built up an audience of elected officials, party workers, lobbyists and

operatives         throughout        the         capitol        and        beyond."        Source:
http://www.nytimes.com/2000/03/12/nyregion/on-politics-the-buzzing-and-guessing-about-a-        hot-new-web-
site.html

In 2002, *New York Times* columnist Iver Peterson wrote: "PoliticsNJ.com is becoming a necessary daily stop for politically minded Web surfers. It serves up a quirky compendium of columns, political news flashes."

Source:        http://www.nytimes.com/2002/04/14/nyregion/on-politics-what-s-the-line-on-the-line-it-depends-who-s-counting.html

The column Mr. Wildstein wrote under the pseudonym Wally Edge was a marketing strategy that proved to be highly successful.  Bruno Tedeschi, then a reporter at *The Record,* wrote: "Whoever is behind the website PoliticsNJ.com is a marketing genius."  The *Star-Ledger* wrote: "This anonymous webmaster knows Jersey politics back and forth." *New Jersey Monthly* wrote: "The driving force behind this provocative and entertaining Web site has built a virtual watercooler for the state's officeholders, news makers, editorial writers, and policy hounds. No doubt anyone with ties to Trenton's political or governmental apparatuses logs on regularly to read the skinny on themselves, their allies, and their enemies." James Barnes of *The National Journal* wrote: "One of the best state politics web sites in the country, this site has a plethora of good Garden State political analysis." Herb Jackson, who is still a reporter at *The Record*, wrote that Mr. Wildstein's website was "mandatory daily reading for the political class in New Jersey." David Rebovich, who was a Rider University political science professor, said: "I'm requiring daily visits by students in my New Jersey Government course this spring who now will have no excuse for not being up on the political scene in the Garden State." Source: https://web.archive.org/web/20030603201809/http://politicsnj.com:80/about_us_01.htm

Under Mr. Wildstein's leadership, *PoliticsNJ.com* hired reporters who covered New

Jersey government and politics in a more traditional manner.  Some of those reporters have gone on to become prominent political journalists, like Steve Kornacki (now with MSNBC) and Matt Friedman (formerly with the Star-Ledger, now with Politico New Jersey).  At some point, PoliticsNJ.com columnists included a former Governor of New Jersey and a former United States Senator.

Mr. Wildstein later built political news sites in New Hampshire, Pennsylvania and New York before selling the organization to the Observer Media Group, which owns the *New York Observer*, in early 2007.  Eight months later, Mr. Wildstein retired from Apache Mills to devote his full attention to political websites.  He became the Executive Vice President of the Observer Media Group.  This became full time and he launched news sites in seventeen states, with a staff of more than fifty. After more than seventeen years, *PolitickerNJ.com* is still in business and continues to thrive.  It is among the few profitable news organizations in New Jersey.  In addition to Kornacki and Friedman, Mr. Wildstein has trained and mentored dozens of political reporters, many of whom have moved up the journalism ladder and are among the top reporters in their field throughout the country.

## PORT AUTHORITY OF NEW YORK AND NEW JERSEY

In the winter of 2010, Mr. Wildstein's close friend, State Senator Bill Baroni, was appointed to serve as Deputy Executive Director of the Port Authority of New York and New Jersey.  Baroni asked Mr. Wildstein to leave his position as Executive Vice President of the Observer Media Group to join him at the Port Authority.  With the approval of Governor Chris Christie, Mr. Wildstein agreed to become the Director of Interstate Capital Projects, a job title that meant he was Baroni's Chief of Staff.

When a reporter for *The Record*, Shawn Boburg, wrote a profile about Mr. Wildstein in

2012, the Christie administration made Mr. Wildstein's missive clear: "He is there in that job because he is well suited to the task of playing a role in reforming the Port Authority in accordance with the governor's goals. If he's not liked for that role, and if he's accused of being zealous in that regard, then we plead guilty," Michael Drewniak, Christie's press secretary, told Boburg. (Source: http://archive.northjersey.com/story-archives/ex-blogger-is-governor-christie-s-eyes-ears-inside-the-port- authority-1.1200896?page=all)

In the same story, Baroni elaborated on Mr. Wildstein's job, saying that he hired him to be the number two New Jersey executive at the agency "to aggressively pursue two things: to pursue New Jersey's and Governor Christie's priorities and to reform this agency. If there are people who have been here for decades, who don't like the fact that we have a real aggressive approach to getting these projects done, they should get used to it. Our job here is not to make friends."    (Source:    http://archive.northjersey.com/story-archives/ex-blogger-is-governor-christie-s-eyes-ears-inside-the-port- authority-1.1200896?page=all)

When Mr. Wildstein resigned from the Port Authority on December 6, 2013 at the request of Charles McKenna, the Governor's Chief Counsel, Drewniak issued a statement to the media: "Mr. Wildstein has been a tireless advocate for New Jersey's interests at the Port Authority. We are grateful for his commitment and dedication to the important work of the Port Authority and thank him for his service to the people of New Jersey and the region." In a personal e-mail to Mr. Wildstein, Drewniak wrote that he sent the statement to the Governor and that the Governor approved it.

In his testimony, Mr. Wildstein admitted and explained the "one-constituent rule." Mr. Wildstein was questioned in depth about the "goody bag" issues, but had no opportunity to inform the Court as to his many accomplishments at the Port Authority. <u>Most of the issues he worked on that were good for Governor Christie were also good for the people of New Jersey.</u>

Christie's strong interest in Port Authority matters enabled his appointees to achieve considerable successes, as well as the clear and obvious failures. <u>This is Mr. Wildstein's first opportunity to speak about his positive accomplishments at the Port</u> Authority.

## BAYONNE BRIDGE

The Bayonne Bridge "Raise the Roadway" project: in 2006, a Panama Canal expansion project was approved that would widen and deepen the existing channels and add a third lane. What that meant for the Port of New Jersey was that by 2016, new freight ships (known as post-Panamax ships) could increase their cargo by more than double.  Simply put, the post-Panamax ships would be too tall to pass under the Bayonne Bridge – a non-negotiable route into the Port of New Jersey.  The immediate problem was that by early 2010, the Port Authority had been unable to move beyond the planning stages and had not yet agreed upon a solution to this issue, despite the rapidly approaching deadline. The Port supports about 269,000 jobs in the NY/NJ region and provides annually for $11.2 billion in personal income, $36.1 billion in business income, and $5 billion in local, state and federal tax revenues.

Mr. Wildstein began working on the Bayonne Bridge navigational issues on May 25, 2010 -- his first day at the Port Authority.  Several options were available and under consideration, ranging from an entirely new bridge to the complete removal of the bridge and possible replacement by ferry service.  Mr. Wildstein's mission, as defined by Mr. Baroni and the Governor's office, was to identify a workable plan quickly and then cut through the bureaucracy of the Port Authority and federal and state agencies with jurisdiction over the bridge to be ready for the post Panamax ships.  The decision was to raise the roadway of the existing bridge to create an additional 64 feet of clearance, without closing the bridge during the construction period. By June 2010, the Board of Commissioners voted to expedite the project, by

September 2010 voted to spend $1 billion on the project, and by December 2010 announced the Raise the Roadway solution publicly.  In June 2012, The White House announced that the Bayonne Bridge would be included as part of the President's "We Can't Wait Initiative," to assure expedited review by federal agencies.  In July 2012, the Port Authority announced that it had cut six months off the original construction schedule, assuring that the navigational clearance will be ready for the larger post-Panamax container ships. The Commissioners awarded a construction contract in April 2013, and the U.S. Coast Guard approved the project in May 2013. Work began almost immediately, with a formal groundbreaking announcement coming in June 2013 by Governor Christie.  The construction created about 6,300 new jobs and spurred nearly $1.5 billion in economic activity.

While hundreds of Port Authority employees and consultants were involved in the Raise the Roadway project, it should be clear that Mr. Wildstein played a major role in keeping the project on schedule and in cutting through multiple bureaucracies to move the project forward.  Going from zero to shovel in the ground on a hugely complicated infrastructure project in forty months is

rare in government.  In prepared remarks at the groundbreaking, Governor Christie said: *"This is how you get things done."*  From defense counsel, the Court heard much about the negative aspects of Mr. Wildstein's forceful personality, but this is one of several examples where the public received an extraordinary benefit from Mr. Wildstein's management style.

## GOETHELS BRIDGE

When Mr. Wildstein arrived at the Port Authority, the agency had been studying options for modernizing the Goethals Bridge for more than thirteen years.  This came despite the knowledge that the 1920's era bridge had two ten-foot wide lanes with no emergency access

shoulder or pedestrian access, even though the modern bridges had a twelve-foot requirement. A 2010 study showed the bridge to be functionally and physically obsolete, along with considerable safety concerns.

Mr. Wildstein was deeply involved in a process to fast-track a full replacement bridge project. The Board of Commissioners authorized a public-private partnership – a design-build-finance-maintain contract in April 2013. The Goethals Bridge replacement was expected to create nearly 2,600 jobs. As part of the Goethals project, Mr. Wildstein pushed for what had become a priority for the Christie administration: the completion of what was called the "Missing Link" – an area of roadway that would connect I-278 with Routes 1&9. This issue had been under review for about twenty years. Groundbreaking occurred not long after Mr. Wildstein left the Port Authority, and in June 2017, one of the spans of the new bridge opened. Again, the public derived a tremendous benefit from Mr. Wildstein's presence at the Port Authority.

## PORT NEWARK CONTAINER TERMINAL

Mr. Wildstein played a key role in a restructured lease between the Port Authority and the Port Newark Container Terminal (PNCT) that include an investment of $500 million in private funds to develop a state-of-the-art container terminal. In addition to securing regional economic stability, the PNCT deal would create 800 new jobs, plus an additional 350 construction jobs. Governor Christie traveled to Port Newark in July 2011 to announce the agreement.

## GEORGE WASHINGTON BRIDGE SUSPENDER ROPE REPLACEMENT

For the first time since the George Washington Bridge opened in 1931, the Port Authority was going to replace all 592 steel suspension ropes. Without doing so, the lifespan of the entire bridge would have been substantially reduced. Mr. Wildstein strongly advocated on behalf of this project, which like many others, had been under review for several years. In addition to

assuring safety, the project also created more than 1600 construction jobs. <u>Mr. Wildstein also</u> <u>pushed for the</u> <u>inclusion of a suicide barrier</u> after learning that safety nets have substantially reduced bridge suicides and suicide attempts at several other major crossings across the world. This was an unsuccessful effort, since others at the agency objected to cost and aesthetic concerns.

## ADDITIONAL INFRASTRUCE MAINTENANCE PROJECTS

Mr. Wildstein worked on the Lincoln Tunnel Helix Rehabilitation, which was approved by the Board of Commissioners in November 2011. The project created construction jobs in a challenging economy, but also increased the lifespan of the Helix, which is more than seventy years old. Mr. Wildstein was also involved in a project to completely resurface the Outerbridge Crossing, and the expansion of the Cape Liberty Cruise Port in Bayonne.

## SUPERSTORM SANDY

Mr. Wildstein's hands-on approach was on display during Superstorm Sandy, after Port Authority facilities – airports, bridges, tunnels, trains, ports and construction projects – suffered considerable damage, and in some cases, rendered unusable. Mr. Wildstein spent nearly three weeks at the Port Authority's Emergency Operations Center in Jersey City as part of a team that would shepherd the agency through this crisis. Mr. Wildstein did not go home for more than a week, sometimes sleeping on the floor, and participating in hourly briefings through the night. With whatever failures the Port Authority may have as a government agency, Mr. Wildstein felt that the people there shined during times of greatest adversity.

## ARC TUNNEL

Another project Mr. Wildstein was asked to become involved in on his first day at the Port Authority was the Access to the Region's Core (ARC) commuter rail project that included a new tunnel under the Hudson River. Construction had begun in 2009 and was viewed as a ten-year project; Mr. Wildstein spent three months regularly attending staff meetings and briefings on ARC. The decision by Governor Christie to cancel the project in October 2010 was made despite Mr. Wildstein's strenuous internal arguments against it. Mr. Wildstein did not agree with the Governor's characterizations that the project was spiraling out of control, and made those thoughts clear to the Governor's staff. Still, Mr. Wildstein admits to closely following the One Constituent Rule and once Governor Christie had made his decision, Mr. Wildstein felt it was his responsibility to advocate on behalf of the Governor within the Port Authority, and to remain silent on his own views.

## AT THE PORT AUTHORITY

Defense counsel, along with testimony from two political appointees of the Governor of New York, unfairly criticized Mr. Wildstein as someone who was widely despised in the workplace. Letters from former employees, such as Marianne Ignar, who worked for Mr. Wildstein for nineteen years; Jordan Lieberman, who worked for Mr. Wildstein at *PoliticsNJ.com*; and Arielle Schwarz, who was Mr. Wildstein's assistant at the Port Authority show a different side of Mr. Wildstein. This argument is bolstered by the statements made on television by another former employee, Steve Kornacki.

As an example, Mr. Wildstein was not asked during his testimony about his advocacy of a seldom used program at the Port Authority where employees could donate their vacation days into a bank, so that co-workers who had depleted their vacation days due to serious personal

issues would not suffer financially. Mr. Wildstein led by example, donating his own vacation days to that bank.

Even among Mr. Wildstein's detractors, there was a consensus that he worked harder than anyone. This information was available to defense counsel, but neither asked Mr. Wildstein about it. Despite a long commute, Mr. Wildstein was typically in his office before 7:00 every morning, and rarely left before 7:00 PM. Often, he worked fourteen or fifteen hours every day. And again, he frequently worked part of the weekend as well. Mr. Wildstein recognized that the Port Authority was a mammoth organization, and that his responsibilities, as clearly defined by Bill Baroni and Chris Christie, required him to be constantly aware of everything that was happening in the agency.

Mr. Wildstein understood that he had no transportation experience when he joined the Port Authority, but he believed that in an agency with more than 8,0000 employees – many of them dedicated, career transportation professionals – it was more important to have someone with business experience who knew how to advance a project forward. Mr. Wildstein's belief is validated by the fact that sometimes career government employees can spend decades engaged in intelligent dialogue without moving forward. There was an adage at the Port Authority that Mr. Wildstein learned early in his time there: "What's the difference between an elephant and a mouse? An elephant is a mouse built to Port Authority standards."

Despite the largesse of the Port Authority, Mr. Wildstein displayed a talent for peeling back the bureaucracy and figuring out how to get things done. In some cases, Mr. Wildstein could help a single individual navigate their way through bureaucratic nightmares. For example, one day a prominent reporter boarded a plane before realizing that he had left his laptop computer at security screening. Upon arriving at his destination, he asked the airline for help and

made calls to the airport. Having no success and frustrated by the inability to get any results, he called Mr. Wildstein. Within ten minutes, Mr. Wildstein called the reporter back to say that he had located the laptop and arranged to have it overnighted to the reporter. Another example came the day after Superstorm Sandy. Mr. Wildstein was informed that a large supermarket chain had hundreds of new emergency generators in a container at Port Newark. The port was a mess, but Mr. Wildstein arranged for a team to search for this one container and expedite its release. As a result, several supermarkets closed due to a loss of power could reopen. In this case, Mr. Wildstein's ability to cut through the thick red tape that often surrounds large government agencies resulted in the ability of these supermarkets to reopen days before they may normally have been able to. He led efforts to recover high-dollar debts owed to the agency, including extreme overdue accounts receivables and toll evaders.

An unhealthy, if not toxic environment existed at the Port Authority before Mr. Wildstein arrived, and continues to exist nearly four years after his departure. The Port Authority is controlled jointly by the Governors of New Jersey and New York – a 50/50 partnership between the two states. Under the design of the interstate compact authorized by Congress in 1921, no state was intended to obscure the other. Each Governor has the right to veto any action taken by the agency. This unusual government relationship, where no one had absolute control, has contaminated the process for decades. For example, in the 1960's, when New York Governor Nelson Rockefeller wanted to use Port Authority dollars to build the World Trade Center, New Jersey Governor Richard Hughes demanded appropriate compensation for the New Jersey side; that is how the Port Authority Trans-Hudson (PATH) transit system was acquired – a compromise between the two states. Between 1998 and 2000, a disagreement between the two Governors led to a fourteen-month impasse where virtually no business was conducted. The

relationship between former Chairmen Anthony Coscia (who was appointed by New Jersey Governor McGreevey) and then-Executive Director Christopher Ward (who was appointed by New York Governor Paterson) was pained, as were the relationships between Chairman Samson and both Ward and his successor, Patrick Foye. Samson's replacement, John Degnan, has publicly feuded with Foye – as recently as June 2017. Part of Mr. Wildstein's missive at the Port Authority, as stated publicly by Drewniak and Baroni, was to outmaneuver New York in what was a constant battle for Port Authority resources.

Descriptions of Mr. Wildstein as some sort of lone wolf are entirely false. To be clear, the Office of the Governor intensely supervised their team at the Port Authority. As per his instructions, Mr. Wildstein received approvals on even the most minute details, such as donating a used vehicle to a New Jersey municipality. The Port Authority wrote an annual check for $300,000 to the State of New Jersey after being billed for management fees by the Office of the Governor. Mr. Wildstein was asked to deal with dozens of individuals within the Christie administration, including direct dealings with the Governor.

Governor Christie set the tone for the conduct of his team at the Port Authority. He consistently told Mr. Wildstein and others that he wanted them to balance what he viewed as a $4 billion inequity in spending on behalf of projects that primarily benefitted New York. In his speech at the Bayonne Bridge groundbreaking, Christie said: "Let me just make it really clear. When it comes to making sure that I fight for the State of New Jersey to get our fair share of Port Authority infrastructure investment to create jobs for the hardworking men of this state, and women of this state, I will not hesitate to bring the fight." Source: https://www.youtube.com/watch?v=daVQH1q0I38

Foye seemingly had his own agenda, his own axe to grind, and his own conflicts.  His testimony that Mr. Wildstein was hated by "thousands" is evidence of his own hyperbole.  Mr. Wildstein did not know "thousands" of people at the Port Authority.  Others who have worked for Mr. Wildstein, including his own assistant at the Port Authority, dispute Foye's characterization.  Foye's own Chief of Staff, John Ma, testified that he leaked the George Washington Bridge story to a traffic reporter for *The Record* – and that he did so the day before Foye reversed the decision to change the lane configurations.  Mr. Wildstein was not asked during the trial what the motives of Foye or former Vice Chairman Rechler might have been, so he had no opportunity to respond to their testimony, or to the false statements made by Governor Cuomo's spokesman.  This simply illustrates the point that many, many people have lied about what they knew regarding the George Washington Bridge.  <u>Mr. Wildstein remains the only one to accept responsibility and tell the truth, damning as it was</u>.

## ACTIVITIES SINCE LEAVING THE PORT AUTHORITY

Mr. Wildstein has struggled with weight issues since childhood.  In early 2014, he began to take his health seriously.  Through a balance of daily exercise and healthier eating habits, Mr. Wildstein lost 94 pounds over a fourteen-month period.  Due to his weight loss and medication, he has not had an attack of Meniere's Disease in over three years.  As part of his desire to remain physically fit, Mr. Wildstein has developed new interests, including rock climbing and kayaking. Defense counsel, in his summation, mocked Mr. Wildstein's weight loss in an unfair and careless attempt to paint an unflattering picture; in that same summation, he openly praised his own client's weight loss.

Over the last two years, Mr. Wildstein has collaborated on a book with Fritz Peterson, a former New York Yankees pitcher.  The book, about Peterson's 1970 All-Star season with the

Yankees, is scheduled to be published in the fall.

Mr. Wildstein is developing new skills as he looks toward a future that does not include participation in politics.  He is currently enrolled at the University of California, Los Angeles (UCLA) in a graded, for-credit online writing certificate program.  Mr. Wildstein expects to be half-way through the program by the end of this summer, and finished in early 2018.

In addition to UCLA, Mr. Wildstein has been continuously enrolled in a local playwriting program since 2016.  Several of the plays he has written have been performed in a theatre workshop.  In addition, Mr. Wildstein has completed four history-related classes at the Ringling College Lifelong Learning Academy.

## COMMUNITY SERVICE

Mr. Wildstein has been asked to run a non-profit foundation founded by former major league baseball player Charlie Hayes aimed at providing "young athletes with the opportunity to play baseball, regardless of their economic status."  Mr. Wildstein has already begun work to help set up the Charlie Hayes Big League Baseball Foundation.  Mr. Hayes has indicated that if Mr. Wildstein is sentenced to community service, he would be willing to have him perform all or part of his hours under his supervision.

## COOPERATION

Mr. Wildstein remains alone in taking responsibility for his role in the George Washington Bridge lane realignment issue, even though others were clearly involved.  He made no effort to destroy evidence, as others have done.  His cooperation began even before the U.S. Attorney's office opened their investigation.  Mr. Wildstein turned over documents to the New

Jersey Assembly Transportation and Independent Authorities Committee. He *willingly* met with the U.S. Attorney's office and the FBI within days of that hearing, and dozens of times after that. Mr. Wildstein has answered questions honestly. None of his e-mails or text messages were deleted.

As part of Mr. Wildstein's cooperation as a government witness, he has not spoken publicly about the George Washington Bridge issue outside of his testimony. Mr. Wildstein has withstood more than three years of often vicious attacks by Governor Christie and his staff, by defense counsel, and by some members of the media. Most specifically, Mr. Wildstein remained silent as the taxpayers of New Jersey financed a bogus investigation by Gibson Dunn Crutcher. Recent media reports place that cost of the Governor's representation at around $15 million. In the absence of any other hard information, the white washed Gibson Dunn report became the sole narrative of events from 2014 until it was discredited by evidence and testimony at trial two years later.

Mr. Wildstein's cooperation has included considerable time answering the Government's questions regarding his knowledge of a plethora of other issues relating to Governor Christie and the Port Authority that he was not involved in and were unrelated to him. Prior to the trial of Kelly and Baroni, this Court, commenting upon the conduct of Gibson Dunn, stated: "It is easy to see why Defendants have cried foul. This Court shares Defendants' frustration. Although GDC did not delete or shred documents, the process of overwriting their interview notes and drafts of the summaries had the same effect. This was a clever tactic, but when public investigations are involved, straightforward lawyering is superior to calculated strategy. The taxpayers of the State of New Jersey paid GDC millions of dollars to conduct a transparent and thorough investigation. What they got instead was opacity and gamesmanship. They deserve

better."

https://assets.documentcloud.org/documents/2648135/Wigenton-Decision.pdf
http://www.nj.com/news/index.ssf/2015/12/judge_slams_christie_law_firm_in_internal_bridgega.html

## LETTERS OF ATTESTATION

Numerous people, who know Mr. Wildstein well, have written letters to this Court.   The authors shed light on who David Wildstein is and describe actions of his that speak strongly about his character and the life he has led.

Steve Kornacki, an on-air commentator for MSNBC, was employed by David Wildstein at a time when Mr. Kornacki was having difficulty finding work.  He expressed his appreciation on television:

> When I got hired full-time at MSNBC in June of 2012, I made sure to write a note to Wally Edge and David Wildstein and telling him 'I'm not here today. I'm not getting this job today. I'm not where I am if you didn't take a chance on me in the summer of 2002.' He had no reason to. I was a nobody out of Boston University living in Massachusetts and trying to convince him that I was worth taking a shot on. And he did. I feel lucky what's happened to me in my career and I'm mindful that I owe a lot of that to him. I loved the three years I spent writing for that website. I loved it. It remains the best job I've ever had. He was a great boss to work for because he knew the game of politics so well that if you were in a situation that if you were in a conflict with a campaign or in conflict with a press secretary, he had your back. I could think of countless examples like that, where he had my back. He knew exactly what to say on my behalf and on behalf of our site. I have a lot of positive things to say about David Wildstein, and I know it's not necessarily what people know about him who have been following just the bridge story."

Mr. Wildstein's wife of over 25 years, Robyn, has written the following to this Court:

> I met David when he was in his late twenties, and we recently celebrated our 25th wedding anniversary. I have known him to be caring, loyal and kind, a wonderful husband, father, son, and friend. He held my hand during a stillbirth and its devastating aftermath. Together, we have raised three children who have

developed into thoughtful and decent young adults. David has always been quick to give his time to those in need, and has taught our children by example to contribute their energy and resources to charitable causes. During our 25 years of marriage, I have known David to be a man who is generous, trustworthy and hard-working. He expects more from himself than anyone else. David briefly lost his way in his earnestness to please his "one constituent." He is supremely embarrassed about this aberration in his adult life.

As your honor is aware, David cooperated fully with the United States Attorney and the Federal Bureau of Investigation, turning over his e-mails and text messages at the start of the investigation of the George Washington Bridge lane realignment. He also turned over these documents to the legislative committee. He did not wait for the U.S. government to come knocking at our door, but rather agreed to cooperate from the outset of this matter. David was fully candid with the U.S. Attorney's office about everything that he has done in his political career, including things that he is not proud of. I believe it is important to note that these embarrassing incidents that defense counsel used to paint an unflattering portrait of David occurred when he was a very young man. David disclosed all this information to the prosecutors to be fully transparent. Watching David come under attack for things he did more than thirty years ago, characterized in the most unflattering way, was a painful period for him and our entire family.

David has expressed remorse countless times for his part in the events of September 2013. He has told his children, his extended family and his friends that he genuinely regrets his role to realign the lanes, and wishes that he had considered the damage this method of political retribution would sow. His behavior was wrong and ill-advised, but David would never carry out this plan on his own. He respects authority and fully understands the chain of command that exists in government and at the Port Authority. I have witnessed the soul-crushing punishment of my husband's self-doubt and guilt that has accompanied the realization of his willing participation in such a thoughtless act.

. . . . . . . . . . . .

I especially admire how David has tried to protect his family from any additional pain. I have offered to accompany David to court each time he has appeared before your honor as a way of reciprocating the kindness and support he consistently offers me. David has repeatedly declined my request, as well as the offer of several close friends to do the same. We discussed asking our children to write letters on his behalf, but David felt strongly that he would not subject them to the discomfort that process could create. More than anything, David regrets how these events have affected our family.

I trust that when you pass judgment upon my husband, your honor will consider the truly decent, kind and conscientious man I know and love. David is quick to admit his faults and attempt to make amends. In the aftermath of this incident, there was never any question that he would take responsibility for his

actions, tell the truth, and accept the consequences. I hope that your honor will be lenient, taking into consideration the level of cooperation and remorse David has demonstrated. He still has much to contribute, and will continue to use his talents for the betterment of our community.

Dr. Luis Marrero, a neonatologist who has known Mr. Wildstein for over 20 years, describes Mr. Wildstein's good character, and provides evidence of it:

The David I know is an extremely hard working, open minded, caring and insightful man. He is always available to help a friend without needing to be asked.



One day I was asking David's advice on colleges for my older daughter. He had just spent innumerable hours helping his daughter with her college search and was eager to give us advice from his current experience. My daughter was just beginning to explore areas of study and college choices. When David heard that she was interested in Journalism he immediately offered to have her spend some time at the New York Observer where he was currently working. My daughter was very excited about the possibility, but disappointed when we were not able to get her to the commuter bus to make the trip to New York City. We thanked David for the opportunity, but explained our difficulty. Without our asking, David said that he would drive her to work with him. David picked up our daughter in the morning and drove her home each day so that she could have this exposure to journalism. She went on to study English literature in college and graduated with honors.

James Weinstein, an investment banker who has known Mr. Wildstein for 33 years, also writes about Mr. Wildstein's good character:

As someone who has known him since he was 23 (and I was 22), I can state that he has always been serious, he has always been a team player, and most importantly, whatever his failings, he has done a lot of good. Not just for his family or for his business, or for the people he worked for, but for the public. David engaged in public service twice in his life. He was one of the most active mayors Livingston ever had, improving performance of multiple areas of government by hiring a top manager to be City Manager, as well as supporting the neediest in the community. I specifically remember David going to Trenton and

lobbying the governor's staff to keep a "Christmas Tree" line item in the budget for the Stepping Stones Preschool. Stepping Stones was a preschool sponsored by the Association for Retarded Citizens of Essex County. It was in its nascent years, and had failed state fire suppression requirements and was in danger of closing. Adding to the difficulty was that it was located in a church basement. David and Bob Franks, our Assemblyman, and my employer at the time, went to Trenton and successfully overcame executive branch skepticism and got the funding. When I drive by the church at Northfield Ave and Laurel Ave to this day, I remember what David did.

Jordan Lieberman, who has known Mr. Wildstein for 17 years, writes:

> Before you sentence David I feel that you should hear directly from me. In the give years that I worked for David he was an important mentor to me and dozens of other young political professionals around New Jersey. David was incredibly supportive of our team going well beyond what a business owner would normally do. David is the kind of person who bought a suit for a reporter who couldn't afford one. He drove six hours to meet another reporter who needed help with her living arrangements and took great joy in quietly seeing younger people succeed. He is the kind of person who would mentor campaign staff on how to avoid trouble. He would never take credit for the fact that dozens of professionals in our community owe their career to his mentorship. The truth is that David is too modest to tell the many stories about how he helped people across the state.

> David is a good man who has already paid a tremendous price for what he has done. I write to you today to ask for leniency in sentencing for David. He has much to contribute if given the opportunity.

Julie Roginsky, Democratic strategist and a friend of Mr. Wildstein, who has known him for more than fifteen years, describes Mr. Wildstein's role in her life and her son's:

> David has been portrayed in media accounts as hyper-partisan but this depiction could not be further from the truth. When he founded and ran his influential website, PoliticsNJ, he was completely non-partisan in his approach. Despite the fact that he was then a lifelong Republican and I am a lifelong Democrat, his website was always fair to me, as it was to those David felt dealt fairly and honestly with him. There are many people throughout the state, on both

sides of the aisle, who have called me over the past several years to recount acts of kindness that David performed as the anonymous "Wally Edge." They, too, take issue with the one dimensional portrayal of David Wildstein throughout this legal process. In times of crisis, David has been among the first people I have called. There has never been a moment in the many years I have known him when he was not willing to lend an ear or provide a helping hand- even during the past several years when our families have lived thousands of miles.  Six years ago, I decided that I wanted to become a single mother by choice.   David was extraordinarily supportive throughout this very emotional and physically taxing process. Shortly before my son's birth, I asked David to serve as his godfather and as the executor of my estate. Having observed David's interaction with his own children, there was no one I would trust more with my son's well-being. Despite the portrayal of David during the course of this trial, I continue to believe that today. Since my son's birth, David has always made every effort to be involved in his life- even throughout the last several years, when he understandably had other important issues on which to focus. He has taught him about baseball, Simon Says, and (to his wife's and my consternation) spitballs. Despite the physical distance, my son considers David and his wife to be members of his family.

Arielle Schwartz, who was Mr. Wildstein's executive assistant at the Port Authority, describes her experience working with Mr. Wildstein:

> David immediately took me under his wing and took a chance on me despite my having only part-time jobs and college internships under my belt. He saw potential in me that I don't think I even saw in myself, and I'm forever indebted to him for that opportunity.
>
> First and foremost, he was a great boss. He frequently joked that I never made mistakes, but that is quite untrue. I am sure that I made mistakes, but he was patient and kind with me, truly investing his time to make sure that I was learning and growing my skill set. He took the time to explain things to me so that I could clearly understand, and I always appreciated his direct and straightforward demeanor.
>
> When I took the position at the Port Authority, I lived at home with my parents and had a commute of over two hours each way. I spent more than four hours in transit each workday for close to a year. But I loved my job so much and was so happy at work, I didn't even complain about the commute. And David was a major part of that happiness.
>
> ...................
>
> Just a few months after I started the job, my mom became extremely ill and much of the weight of her caretaking fell on my shoulders. My mom was in and

out of the hospital multiple times, and I experienced severe anxiety and stress. David was effusively understanding-if I needed to leave early to take her to the hospital or be around to help her with something, he allowed me to, no questions asked. Going to work became my "safe space," a happy escape from the sadness and fear I went home to each night. How many people can say going to work is an escape for them?

During my time at the Port Authority, the administrative assistant that sat next to me fell ill with cancer and passed away. Ingrid and I had grown incredibly close, and my heart was shattered when she died. David immediately sprung to action, personally paying for her entire family to have dinner after the funeral services, and later on working with her son as he prepared to get his general education diploma (G.E.D.), because all his mom wanted was to see him get his degree. David purchased review books to help him pass his exam, and got him a position in the Port Authority's mailroom. He did all of this out of the kindness of his heart, and it truly touched me.

To see David painted in the media as some sort of cruel, heartless monster has been heartbreaking for me. David has made mistakes-some unbearably big mistakes-but he's not a bad person. He's a good person that made a bad judgment call, and I know that weighs on him each day.

One of the many things that sticks out in my mind about David is how much he adores his family. His wife and children are his entire world-hearing him tell stories about them made me feel as if I knew them personally, though we'd never met. He joked that on *his* birthday, he'd take his wife to the jewelry store to buy *her* a gift for spending another year with him.

..........

I know David regrets his actions with regard to the George Washington Bridge lane closures, and this lapse of judgment will live within him forever. His actions on this matter do not reflect the person I worked with at the Port Authority, and I hope Your Honor will consider this in his sentencing.


C. Louis Bassano, a former six term New Jersey State Senator who has known Mr.

Wildstein for over thirty years, asks that this Court treat Mr. Wildstein leniently:

I don't believe that media coverage of the trial accurately captured the David I've known for so long. I don't believe people can cherry-pick a few stories about things David did in his 20's and use them to define who he is now as a 55 year old man. For every distasteful story I recently read about David's behavior in the 1980's, I can think of many more where he demonstrated how smart, successful

and kind he truly is.

I had the opportunity to represent Livingston in the New Jersey State Legislature for approximately ten years. During that time, I saw some really good things that David did as a local elected official. While it's quite easy for the media to highlight some of the negative things people might say about David, it doesn't tell the entire story.

David is not a perfect person, but I haven't seen any perfect people in my nearly 50 years in and out of government. While David clearly made mistakes, and closing the bridge was a big one, it's clear to me that he realizes that what he did was wrong. David's behavior in the Fort Lee lane closures, disgusting as it was, is not a complete picture of who he is as a person. The good he has done in his life, and the contributions he has made, far outweigh this one mistake that will unfortunately define his career. In my view, as a Senator who was involved in the confirmation of prosecutors and judges, I believe David is not the kind of person who should be put in prison. He has already paid a heavy price - he will never work in politics again - and he has accepted responsibility for what he's done. He has done what few people are willing to do - he has taken responsibility for his actions.

Thank you for your consideration of leniency.

Mr. Wildstein's brother Drew describes how wonderful a family man David is:

In my opinion, there is no better way to see what kind of man my brother David is than to look at how he handled the most terrible moment of his life, the loss of his child. I will never forget that day. My sister-in-law, Robyn, was at the very end of a full-term pregnancy with what would have been their third child. David took her to a regularly scheduled appointment with her obstetrician, and during the routine ultrasound, the doctor was unable to find a heartbeat. Robyn and David went to the hospital the next day so that Robyn could deliver their stillborn son. The following day, they went to the cemetery and buried him. I have never seen anyone as stoic as David was during that horrible time. As an uncle, I was having a hard time dealing with my own loss, and despite David's personal grief and pain, he spent time helping me cope. His supportive nature has served as a model for me. I watched him support his wife, his children and the rest of our family deal with a loss so horrible that I cannot even begin to imagine.

My brother is always kind and compassionate at the times that it matters the most. David is devoted to his family. He is a wonderful husband to Robyn, and father to his three children. I have never seen a marriage as strong as the bond between Robyn and David. In fact, I am envious of how much they love each

other. It is no secret to anyone in the Wildstein family that David and Robyn are truly soulmates. His wife and his children are the most important parts of his life. He would do anything for Robyn and for his kids. David's commitment to family extends beyond his own home. He is a wonderful son, brother and uncle. He was also an incredible grandson when our grandparents were alive. For the twelve years that our grandmother lived alone following the death of our grandfather, David was amazing in his devotion to her. He spoke to her every day, usually more than once a day. He always made time for her, and she was an important part of the lives of her great grandchildren. During the days leading up to her passing away, David was at the hospital constantly, spending several nights in a chair in her room so that she would never feel alone. I also had the honor of working with David in our family business. He is a man of tremendous compassion who treated people nicely and fairly. For me it is very frustrating to see how others depict David in the media, because to the people who really know him best, like me, this is not an accurate portrayal. David is a wonderful person. I admire him, I respect him, and I love him. I can also attest to the fact that David has loved politics for as long as I can remember. I think when he got his first job, on the staff of a New Jersey State Senator for $100-a-year, he was twelve and I was seven. I mentioned earlier that my passion is and will always be baseball. David's passion was always politics, and being forced to give that up for the remainder of his life is, for someone like him, like a knife through his heart.

One other thing I would like to mention is how proud I am that my brother, who battled weight issues his entire life, used the time that he was dealing with his legal issues to get serious about becoming healthy. I read a news story on line where a reporter wrote that this was a result of stress. I know David and I know that he typically gained weight during the most stressful times of his life, so the report was of course not true. David became committed to leading a healthier life for himself and for his family. He completely retrained himself how to eat, and for the first time in his life he became dedicated to exercise. I was as surprised as anyone to find out that in his early 50's, he became a lover of rock climbing. How he had handled himself over the past few years only increases my view of David as a role model.

What David did at the George Washington Bridge was wrong. I know that and so does he. I have never seen anyone more genuine in their regret and remorse. He knows that actions he took at the George Washington Bridge were wrong. I admire him for standing up and telling the truth, and for accepting his share of the responsibility. He very much regrets the pain that he has caused his family. I wish, of course, that this never happened, but now that it has, I respect the fact that my brother did the right thing and cooperated with those seeking to find the truth. My

hope is that you will consider what David has accomplished in his life and the good that he has done for his family when you consider his sentence.

Fritz Peterson, a former Yankee baseball player, who has written a book with Mr. Wildstein's assistance, speaks of the important role David has played in his life:

I am a 75-year-old cancer survivor who has faced significant struggles since I left professional sports 40 years ago, and David has helped me to relive perhaps the greatest time of my life. More importantly, he is helping me financially by working with me on this book. I live predominately on my baseball pension and social security – both relatively meager amounts--since ballplayers like me did not make much money during the era that I played (not at all like it is today.) David is generously making it possible for me to earn additional money that will allow me to support my extended family. He is dependable, hard-working, and has never asked me for anything. When I offered him some old baseball memorabilia as a token of my appreciation, he told me that it should remain in my family so that my grandchildren might enjoy it someday.

I can tell you that David has helped to change my life. It is hard to even express how it feels to go from being cheered by thousands of fans at Yankee Stadium to a life where few people remember who I used to be. He has made me feel relevant again. He has been a very loyal friend. David has never said no to any request I have made of him. We are in contact nearly every day and he has become an important part of my life. The things that I read about him on the internet do not accurately reflect the person whom I have come to know. I value his friendship very much. I know this might sound a little selfish, but I would most respectfully ask for leniency on his behalf because I very much need him in my life right now. I need his help to market my book once it is published in the fall, and I rely on his advice and his judgment. His absence would leave a void in my life.

. . . . . . . . . . . . . . .

David is a very private person and does not display his emotions easily. It was at dinner in January that he finally opened up and discussed his feelings toward the bridge issue that has ruined his life. There is no doubt to me that David is deeply regretful of his actions. He has expressed much remorse for what he did and frustration with the foolishness of the bad decisions he made. His sincerity in those statements is clear. He expressed guilt for the innocent people who were wronged by his bad act. This has been a difficult time for David and his entire

32

family. I have told him that all of us make mistakes and that he will have the opportunity to right his wrongs going forward. I have told him that we are all judged by the entirety of our lives and not on a single act.

Judge Wigenton, I respectfully ask you to show mercy for my friend, David. He is a very, very good person and I am confident that the remainder of his life will be led with the utmost integrity. He has so much to offer in people. I pray that you will consider my request. Thank you for the opportunity to be heard.

Charlie Hayes, who played for various major league baseball teams, including the Yankees, writes about David's help with the Hayes foundation:

Life has treated me well, and I feel strongly that I want to give something back to the community. I have begun the process of starting a non-profit foundation, the Charlie Hayes Big League Baseball Academy. I have asked David to run this foundation for me because I have complete confidence in his abilities, his leadership, and his integrity. He has agreed to volunteer his time and has aiready begun his work. Our skills are different and together we make a great team.

The mission of my foundation is to provide young athletes with the opportunity to play baseball, regardless of their economic status. We will create programs to help young players strengthen family values, improve their self-esteem, build character and learn self assurance. We will seek to provide stability to these young players during their adolescent years, teaching unselfish decision-making skills on and off the field. We never want to see anyone turned away from the baseball diamond. Our aim is to prevent delinquency and provide constructive training toward athletic principles that will allow every athlete to have an opportunity to reach his or her potential. Our support programs help athletes who may be homeless, where we offer an environment to allow them to think and seek the help that is needed to excel.

.......I am aware of the legal issues that David faces. While I surely do not condone his behavior, David has impressed me as a person who regrets a terrible decision and is worthy of a second chance. If you are willing to sentence David to a term of community service, I would be glad to have David complete all or part that service in the launching of my foundation. Every day, I hear stories of young athletes who fail to reach their potential in life because they lacked the financial means to pursue their dreams. What I am proposing could be an important step in extending the opportunities of sports to young men and women in need, and hope that you will permit David to spend his time helping me to create and operate a

33

meaningful vehicle for youth whose circumstances might otherwise put them into a troublesome path.

Ken Kurson, an author and former editor-in-chief of the Observer newspaper, writes:

Even though I am intensely interested in New Jersey and covered the events personally, I cannot pretend to know all the facts behind the scandal that has become universally known as "Bridgegate." But I do know David Wildstein. And David Wildstein is one of the most principled men I know.

One of those principles is loyalty. I've seen astounding acts of fealty from David over the years and I fully believe that his role in Bridgegate, while stupid and wrong, came from a place of loyalty. I think he thought he was advancing an agenda he believed in on behalf of a politician he believed in.

David Wildstein made some bad decisions. He's taken responsibility for his actions in a way that no one else associated with this regrettable episode has. He has helped bring justice to bear and I personally watched David agonizingly atone for his misdeeds by testifying, truthfully and fully deploying his trademark ridiculously great memory, against those accused of crimes in this case. That ought to be worth something as he faces the music for his misdeeds.

I write to you with the hope that David's sentence be considered alongside the unique value his cooperation provided.

Dr. Mary Osborne, a Clinical Psychologist, who has been friends with Mr. Wildstein for over twenty years, offers anecdotes about his strength of character:

I am writing on behalf of my good friend, David Wildstein. I respect how valuable your time is so I am going to try to succinctly describe the man I have had the pleasure of friendship for the last 22 years. David and his family, are like family to mine. I feel I have a unique perspective as David's longtime friend to share aspects of his character with you. Although the current situation before you involving David may raise questions about his character, I ask you to consider the David I know in your sentencing. My characterization of David reflects the history of a good man, a family man and one who truly cares about others. David is a caring, compassionate, generous and loyal friend. I want to share a couple of examples to support my portrayal of David. The Blizzard of January 1996, wrecked havoc in New Jersey. My husband, a physician, had to stay at the hospital for 3 days. I was left home with our 3 year old, and four month old daughters. When David heard that we were home alone, he weathered the harsh elements and drove

to pick us up and bring us back to his home. A home cooked meal with friends warmed our hearts and allayed our fears. This is just one simple example of David's kindness and caring.



..........

Although David has never discussed the specifics of this case with me, we have discussed his emotional state and psychological distress. David is contrite, self-reflective, takes personal responsibility for his actions and is distraught by the stress his actions have caused others. David is also deeply saddened by the loss of friendships.

Your Honor, David is genuinely remorseful. The David that I know on a personal level is not the David that was beguiled by New Jersey politicians. Thank

you for the opportunity to share a little about my dear friend David. I respectfully ask that your sentencing decision take into account the many positive contributions David has made, and urge your leniency in this matter.

Shirley-Mae Smith, a former Livingston Planning Board member who has known Mr. Wildstein for over thirty years, discusses, among other things, his work with and on behalf of young people:

During the campaign David was a true Pied Piper. He always had a few teenagers following him trying to be his friend. After all, he was only a couple of years older than they and he was their councilman who got things done. David wanted the kids to learn that they could influence their own lives by actively working to make differences in their school and town. He started a special committee on our campaign for school kids to participate in the weekly meetings and undertake some of the campaign jobs. he became the Kiwanis sponsor of the Kiwanis' youth group located at the high school, the Key Club, he helped some interested kids get summer clerkships working in the Senate and House of Representatives in Washington D.C., and he worked hard while on the township council to create a new committee charged with planning activities for the kids positive activities to do to keep them busy and out of trouble. They started their Project Graduation, an alternative drug-free all-night event that is still held every year and for which they have multiple fund-raising actives throughout the year such as an auto rally, and an intergenerational prom.

But the two most important things that David accomplished for the youth were the creation of the Monmouth Youth Center and the position of non-voting member on the township council for a high school senior. What experiences. But that is not all. David cared about all people-all ages. He helped push through the development of the first Senior Citizens Housing Complex located in Livingston. At a Council Meeting, Mayor David Wildstein lectured an angry crowd that had come out to oppose the creation of a home for disabled young people. He asked, where were their consciences? This was the real David who cared for the youth, the elderly, the disabled.

David made so many positive changes during his public career in Livingston. However, equally important to me is to remember David for the joy he felt when he could improve the lives of others.

I remember the pleasure he got when the servers at the Ritz Diner could enjoy a normal Christmas dinner with their families because David had organized

three shifts of volunteers to cover for them. I remember how important it was to David that he be sworn in as Mayor of Livingston while his one remaining grandfather was still alive and able to swear him in.



     I don't know who the David Wildstein mentioned in the newspaper reports about "Bridgegate" is. It is certainly not the David Wildstein I knew and loved as a favorite friend who brought so many good people into our lives, who would do anything within his means to makes life better for others, and who loved to laugh along with everyone else. I always said that the David I knew was a good person. It must have been his success at such a young age that turned his head.

     David was impatient for change and he did not tolerate fools or procrastinator well. If you had a task on a project that David had interest in, you had better put your nose to the grind stone and do you job. And as I prepare to take my first ride on the soon to be completed Bayonne Bridge replacement which David championed for, I say thank you David. You really did achieve some important positive changes during your tenure at the Port Authority.

     Please Judge Wigenton, I know David really regrets his immature pomposity of these last few years and has plans to continue his work on developing his real purpose for the remainder of his life. Please remember this real David when considering his sentence.

Jeanne Silberman, whose 30-year friendship with Mr. Wildstein dates back to when she was in high school, describes acts David has done for the betterment of the community:

     I have known David for over thirty years. It is with fondness that I write this letter on Memorial Day Weekend because every year that I was in high school I spent with David building a float for our town parade.  That is how I remember David.  David was the youngest ever-elected public official to our Township Counsel and inspiration to many my age in our town.  David spent thousands of hours (and I do not exaggerate) mentoring students, like myself, and classmates of

mine, and set a great example.  The Memorial Day float that we built each year was for the Kiwanis and Key Club, both service organizations in our town that David was actively involved.  Through these organizations, I learned the importance of volunteerism and work ethic, two important lessons I carry with me today.

I was lucky to have met David at age 14.  David never treated me like a kid.  He introduced me to experiences to which I would never have otherwise been exposed.  David organized trips to Washington, DC for high school students. We visited the White House, met diplomats and volunteered at homeless shelters.  I remember David introducing me to a homeless man named Stacey Abner, whom he had known from his college years in Washington, who lived for years under the steps of the Capital.  David would instill in us that although we may come from privilege, we should not be spoiled but instead use our privilege to help others.  I traveled to leadership conferences throughout the United States all because of David.  I learned to be a confident, driven woman because of him.  David wanted to mentor us and expose us to real issues. He invested in us, in me.

I remember high school fondly.  I was an active student – always trying to be a doer. David pushed me to be a better person and do more for the community and to understand the importance of civic involvement.  Sometimes it was tough love. I remember being woken up by the phone ringing at 7 am on a Sunday when I was a senior in high school. I wanted to sleep in, but we had a coat drive going on and David had arranged for trucks to pick them up at 7:30 and someone needed to be there. I went.  When David ran for reelection some of the theater kids put on production of "Pippin" to raise money for his candidacy.  Although he ran as a Republican and most of the kids participating leaned left, we didn't hesitate at all to organize a fundraiser to help the man who always had our back and was an inspiration to us.  Politics aside it was the candidate we supported.

David has always been an advocate for youth and was instrumental in bringing a Youth Appreciation Week to our Town.  It is still celebrated today, although I doubt many remember (or will admit) that it was David's idea!

David always wanted us to dream big.  When we wanted to have a fundraiser for the Make A Wish foundation he helped us secure the Cody Arena. We raised $25,000. Not bad for a group of high school students.

Following high school, David was instrumental in getting me an internship at Congressman Bob Franks Office in the 7th Congressional District of New Jersey. I worked for Bob for two years in college and all through law school. David opened that door for me and would always check in on how I was doing and what I

was learning.  He encouraged me to continue to be involved.

Since graduating law school, David and I have remained friends. I know his wife and three amazing children.  David is a loyal family person who mentors his own children like he did me.   We have been lucky enough to share in wonderful celebrations together like my wedding and his children's Bar Mitzvahs. David has met my three children and I have shared with them about my childhood mentor and friend.

As a mom of three children growing up in the town where I was raised and shared so many invaluable experiences with David Wildstein, it was hard for me to explain how my mentor could plead guilty to such an act.  I explained to them that David continues to be a good man who made a mistake (as we all will in our lives). He did the right thing by taking full responsibility and acknowledging that he broke the law.  It does not change my opinion of David or my firm belief that he has done far more good in this world than bad.

I know David well. I have never known him to be the calculating, manipulative mastermind that has played out in the news over the last two years. Yes he was obsessed with politics and yes he would serve his boss, maybe at all costs. I believe he got caught up into something that was bigger than him. In my life David has only been a mentor, a teacher.  David has helped New Jersey and I believe the State would not benefit from sentencing him to any prison time.  David understands his mistakes, has owned them and has already paid for them greatly. I believe it is time to put "Bridgegate" behind us and David should be allowed to resume his life.

Thank you for reading this letter in support of my friend.


Retired New Jersey Superior Court Judge, David Issenman, describes David and requests the leniency of this Court in imposing sentence:

I write to you on behalf of David Wildstein in the hope that you will favorably consider imposing a non-custodial sentence upon him.

I do not make this recommendation lightly; but I believe that in the weighing of all the appropriate factors, the mitigating ones substantially outweigh the aggravating ones, and a non-custodial sentence is appropriate.

I knew David from politics for a long time before I became a Judge over 25

years ago. He is not a bad person; but he did a bad thing. In my discussions with David, he takes full responsibility and acknowledges his absolute guilt- and stupidity. He is remorseful and contrite. Indeed, he is not only sorry for the act itself, but also for all the harm his actions have unleashed upon so many people.

........

David has acknowledged his guilt, co-operated and is remorseful. He is humbler and wiser and I most respectfully do not believe that incarceration would be appropriate for David. It serves no useful purpose in this case.

I ask that you sentence him with mercy, so that he may have the chance to redeem himself.

Marianne Ignar, who formerly worked for David for 19 years, describes David's good acts:

David has been a thoughtful and caring friend to me over the years. A couple of examples come to mind. I once had a personal issue that required my leaving work early for a meeting. David also left work early and stayed with me offering support and guidance even though my meeting ran past regular office hours before it was resolved. Another example is one Christmas when my nephew was around 12, I was looking for ideas as to what I could to get him. I had told the girls and David the only thing I knew he was that he was interested in was political science. What do you give a child interested in political science? David suggested I give him presidential buttons. David is a collector and offered to give me some buttons he had duplicates of. He advised me what kind of frame to buy and where to buy it, and he also suggested how to position the buttons. My nephew was thrilled!

In conclusion, I hope I have met my goal to show you a small glimpse of the patient, level-headed, good listener, good communicator, giving, helpful, caring and loyal friend I have known for so many years. Even in light of recent events for which I am writing this letter, my opinion of my trusted friend and coworker has not waivered.

Assemblyman Raj Mukerji, an attorney admitted to practice in this Court, who first met Mr. Wildstein 15 or 16 years ago while providing technological and cybersecurity support for Mr. Wildstein's website, PoliticsNJ.com, notes:

I have witnessed a profound change in David's demeanor and personality. The once-always-restless political junkie has found a silver lining in his legal clouds, taking advantage of the time previously devoted to his professional life to focus on his family and find inner peace. He is truly remorseful for his wrongdoing and seems to be devastated by the impact of his actions. This may

have contributed to his decision to cooperate with the United States and atone. Moreover, the political world he once loved, the world he aspired to enter since childhood as a political wunderkind, has no place for him anymore and never again will, and he seems to be perfectly at peace with that. There is no risk of him reoffending. Somewhere along the way, David grew intoxicated with his newfound power, but he has woken up to a hangover that ensures it will never recur.

It is especially a shame because David possesses extraordinary attention to detail; an encyclopedic knowledge of history, politics, and government; and a razor-sharp memory that would have allowed him to contribute in so many ways to our democracy if his public service had not been interrupted as a result of his actions. During his tenure as the infamous "Wally Edge," he had a soft spot for staffers and behind-the-scenes political operatives, a penchant for promoting youth aspiring to hold public office or enter the political arena, and a mission to fight apathy in our democracy. When the website was sold to *The New York Observer*, he was so fiercely protective of the myriad of sources he had developed over the years that he would not allow negotiations to progress unless he retained full ownership of the AOL e-mail address that so many sources had used to communicate with him over the years. With no formal training or prior experience as a journalist, David exhibited an uncompromising commitment to principles that conventional reporters hold sacred.

I ask that the Court consider these factors and the impact of the ordeal on his innocent wife and children in determining an appropriate sentence for a defendant who has certainly learned his lesson. Thank you for your consideration.

Finally, Steven Issenman, Mr. Wildstein's friend for 35 years, writes:

I write to you to kindly, respectfully, and sincerely ask for your leniency while considering the sentence of my dear friend, David Wildstein.

Although this entire episode generated significant media coverage about David, most of it was unfavorable and failed to accurately portray the David who I've known for 35 years.

David is a wonderful, brilliant, giving, funny and kind man. He is deeply passionate. He is an amazing father and incredibly dedicated to his family. He is one of the most generous people I know. He has been a tremendous friend to me and an amazing mentor to countless other young men and women as they started their careers. He has always given freely and tirelessly of his time, counsel, labor, and friendship. The kindness, compassion, support and empathy that David showed to me and to so many others over the years was unfortunately never captured or showcased during the trial's coverage, but at his core, David is truly a good person.

41

I can frankly share with you that, as difficult as this entire ordeal has been for so many people, I know it has caused David a considerable amount of deep introspection and self-examination. He has expressed genuine remorse and taken responsibility. He has viewed this as a personal growth opportunity, one that has been humbling but valuable and meaningful. He has learned and evolved as a person.

Having known David for most of my life, and having personally witnessed his sincere remorse and personal growth throughout this process, I know he has learned valuable lessons that he will apply throughout the rest of his life Although there was no opportunity for the above sentiments to be conveyed during the trial, I hope this helps to show a side of David that deserves to be taken into account.

Thank you for any consideration you might afford my friend David during this difficult process

## CONCLUSION

As the letters written on David's behalf attest he is a good person who did something wrong that should be forgiven. Unlike Kelly and Baroni, who refused to acknowledge their guilt or to cooperate, and unlike David Samson, the former Chair of the Port Authority, who did not cooperate yet received a probationary sentence for his conduct at the Port Authority, David began cooperating at the very outset of the federal government's investigation. ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆. David's cooperation continued throughout the trial of Kelly and Baroni. All told, Mr. Wildstein spent hundreds of hours, on days, nights, and weekends, working with AUSAs and investigators from various agencies, providing highly detailed information, documents, and computer records, relating to the Government's case, which was extraordinarily complex and time-consuming. Although Kelly and Baroni were the only ones charged at trial, there were many other persons about whom David had provided information to the

Government.  When he testified at trial for 8 days, Mr. Wildstein's testimony was consistent with the information he had provided to the government.  Mr. Wildstein testified that the genesis of the lane realignment came from him.  He accepted responsibility.  The suggestion of a bad idea, however,  does not make him *more* culpable than those with higher levels of authority who authorized the implementation of that idea.

Given the breadth, duration, and honesty, of Mr. Wildstein's cooperation, and the important message to send that cooperation is an important aspect of rehabilitation, I would respectfully request, on behalf of Mr. Wildstein, that he be sentenced to a term of probation.

Respectfully submitted,

Alan L. Zegas

cc:  Lee Cortes, AUSA